NEW YORK CENT. & H. R. R. CO. et al. v. INTERSTATE COMMERCE COMMISSION.

(Circuit Court, S. D. New York. February 8, 1909.)

1. CARRIERS (§ 26*)—INTERSTATE COMMERCE COMMISSION—ORDERS.

Under the provision of section 15 of the interstate commerce law (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901. p. 3165]), as amended by the Hepburn act (Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 [U. S. Comp. St. Supp. 1907, p. 900]), that "all orders of the commission, except orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time, not exceeding two years, as shall be prescribed in the order of the commission" unless suspended or set aside, etc., an order relating to rates is not invalid because it fails to prescribe the time it shall remain in force, but in such case the order remains in force for two years, the maximum time prescribed by the statute. The commission should, how-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ever, comply with the implied requirement of the statute and in all cases fix the time.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

2. CARRIERS (§ 32*)—INTERSTATE COMMERCE COMMISSION—AUTHORITY—ORDERS.

It is one of the primary purposes of the interstate commerce law to remove discriminations in rates; and under the broad powers conferred on the Interstate Commerce Commission "to execute and enforce the provisions of this act" and "to make an order that the carrier shall cease and desist from such violation to the extent to which the commission find the same to exist" (Act Feb. 4, 1887, c. 104, § 12, 24 Stat. 383 [U. S. Comp. St. 1901, p. 3162], and section 15, as amended by Hepburn Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 [U. S. Comp. St. Supp. 1907, p. 900]), where it has found that discrimination exists against a shipper or commodity, it may prescribe a relative rate, as that the charge shall be the same as that for a similar service to other shippers or on another similar commodity, instead of fixing an absolute maximum rate, which would enable the carrier to continue the discrimination by reducing the rate to other shippers or on the other commodity.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

3. CARRIERS (§ 32*)—INTERSTATE COMMERCE COMMISSION—ORDERS.

The provision of section 15 of the interstate commerce law (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by the Hepburn act (Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 [U. S. Comp. St. Supp. 1907, p. 900]), that, where the commission shall find that a rate or any regulations or practices affecting rates are unjustly discriminating, it shall "determine and prescribe what will be the just and reasonable rate or rates; * * * and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed," does not require the commission, on finding that a certain rate is discriminatory, to prescribe in detail regulations and practices which are not necessary to remove the discrimination, but which may become necessary for the protection of the carrier, and it may properly authorize or permit the carrier to make such regulations should the necessity arise.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

4. CARRIERS (§ 32*)—INTERSTATE COMMERCE COMMISSION—ORDERS.

An order of the Interstate Commerce Commission designed to remove a discrimination in rates is not invalid or inoperative because it does not go as far as it might, and fails to correct other discriminations found to exist.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

5. CARRIERS (§ 32*)—INTERSTATE COMMERCE COMMISSION—ORDERS.

The Interstate Commerce Commission in inserting in an order commanding carriers to desist from a discrimination a condition for the carriers' benefit cannot be said to have acted outside of its province, even though the subject-matter of the condition be regarded as something subsequent to transportation.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

6. COMMERCE (§ 88*) — INTERSTATE COMMERCE COMMISSION — CONDUCT OF PROCEEDINGS.

The Interstate Commerce Commission is an administrative tribunal dealing with practical problems, and, so long as parties affected by its orders appear and are fully heard, it has power to grant such relief as the facts shown upon the investigation call for, even though such facts may be presented by evidence technically outside of the issues raised by the pleadings, but which were germane to the subject-matter of the investigation.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 88.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**7.** CARRIERS (§ 32*)—INTERSTATE COMMERCE COMMISSION—ORDERS.

An order of the Interstate Commerce Commission requiring railroad companies to cease and desist from according to flour milled in transit at interior points a lower rate for export than was imposed upon grain brought from interior points by a milling company to New York City, and there ground into flour and other grain products and exported, *held* within the powers of the commission and valid on a motion for a preliminary injunction to restrain its enforcement.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

Ward, Circuit Judge, dissenting.

In Equity. On motion for preliminary injunction.

Geo. F. Brownell, for complainants.

P. J. Farrell, for Interstate Commerce Commission.

W. F. Rowe, for Hecker Jones Milling Co.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

NOYES, Circuit Judge. This is an application for an injunction restraining pendente lite the Interstate Commerce Commission from enforcing its order dated June 24, 1908, in a proceeding instituted by the Hecker-Jones-Jewell Milling Company against the present complainants as defendants therein. In its complaint in such proceeding the milling company alleged, in substance, that it was engaged in manufacturing wheat into flour at the city of New York both for domestic use and for export; that it was obliged to obtain its supply of wheat in various Western states, and to ship the same to its mills at New York; that the defendant carriers charged it a higher rate upon the wheat shipped over their lines and thereafter ground into flour and exported than they charged upon wheat ground by millers at Chicago and vicinity and exported, and upon wheat ground by foreign millers and sold in foreign markets in competition with its products; and that such rates constituted an unjust discrimination against it. In its prayer for relief the milling company asked for an order "fixing the rate upon wheat and other grains shipped from Chicago points to New York Harbor for manufacture there into flour and other grain products, and thence exported, at the same amount as if fixed upon wheat and grain shipped from Chicago points to New York Harbor points, and thence exported as wheat and grain." It also asked for such regulations as should prevent the continuance of the discriminations complained of, and for general relief. After notice and a full hearing, the commission made an order requiring the carriers to cease and desist on or before the 1st day of September, 1908, "from according to flour milled in transit at interior points a lower rate for export than is imposed upon the grain of the complainant at New York City, which is subsequently ground into flour and other grain products and exported; but this order is made upon condition that said defendants establish the necessary regulations to make certain that the grain upon which the export flour rate is applied is actually exported as flour or other grain products, for which defendants may impose a proper charge to cover the cost of executing such regulations."

The following is a brief summary of the situation: The Hecker Milling Company obtains its supply of wheat in the West; brings it to New York City, where its mills are located, over the lines of these complainants and by other routes; grinds the wheat into flour and other grain products; supplies an extensive domestic market; and does a large export business. It has heretofore been charged the domestic rate upon all its wheat, regardless of the ultimate destination of the flour ground therefrom, notwithstanding that both export flour and export grain take a lower rate ·than domestic grain. The export flour rate also applies to grain shipped from the West and "milled in transit" at interior mills upon the carriers' lines. Under these conditions, the milling company complained to the commission that it was being discriminated against; that it was charged a higher rate than western millers and millers who ground the export grain in foreign countries. It asked specifically that the rate charged it upon grain which. it ground and exported as flour should be the export grain rate. The commission, however, did not grant this relief, but did order that flour for export milled in transit at interior points should not receive a lower rate than that accorded to the milling company's grain which it ground into flour and other grain products and exported. Assuming that flour milled in transit should continue to take the export flour rate, the milling company's grain which it might grind into flour and export would take the same rate. In other words, the commission treated grain milled at the seaboard as being milled in the course of transportation to foreign countries, and took away the advantage which grain milled in transit at interior points had previously enjoyed.

The carriers now ask this court to restrain the enforcement of the order of the commission pending proceedings to set it aside. They assert that the order is invalid and unenforceable upon various legal grounds, the consideration of which requires the construction of several important provisions of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), as amended by the Hepburn law (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1907, p. 892]). And, as the determination of these legal questions upon this application has required as exhaustive an examination of them as would be necessary upon final hearing, we deem it desirable, in view of the importance and novelty of the subject and of the able presentation of the case upon both ̦sides, to express our opinion at greater length and in more complete form than would ordinarily be the case in passing upon an application for a preliminary injunction.

The objections to the validity of the order may be conveniently considered as they appear in the complainants' brief.

The first ground of invalidity urged is that the order fails to specify the time during which it shall remain in force. Section 15 of the interstate commerce act as amended, under which this order was made, provides that:

"All orders of the commission, except orders for the payment of money, shall * * * continue in force for such period of time, not exceeding two years, as shall be prescribed in the order of the commission."

The commission did not state in this order how long it should remain in force. Strictly speaking, the directions of the statute were not complied with. Nevertheless we think that this inaction on the part of the commission did not invalidate the order. The act itself prescribes the maximum time an order can remain in force. The commission may prescribe a shorter time, but, in the absence of such limitation, an order remains in force the maximum time—two years. The law reads the limitation into it. But, while we think that the absence of an express limitation in an order does not render it void, we perceive no reason why the direction implied in the statute that the time be prescribed in the order should not be complied with. We find no merit whatever in the contention of the commission, as stated in its answer, that there is a distinction with respect to the application of the two-year limitation between affirmative and negative orders.

The second objection to the validity of the order, as stated by complainants, is that it fails to determine and prescribe the just and reasonable rate or charge to be observed as a maximum, and the just, fair, and reasonable regulation or practice to be followed in respect of the transportation involved. The section of the interstate commerce act already referred to (section 15) empowers the commission whenever, after a hearing, it shall be of the opinion that any rates or charges or regulations or practices relating thereto are unjust, unreasonable, or unjustly discriminatory in violation of the act, to "determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged; and what regulation or practice in respect to such transportation is just, fair and reasonable to be thereafter followed; and to make an order that the carrier shall cease and desist from such violation, to the extent to which the commission find the same to exist and shall not thereafter publish, demand or collect any rate or charge for such transportation in excess of the maximum rate or charge so prescribed, and shall conform to the regulation or practice so prescribed." The point of the complainants' contention is that the commission, having found that the rates so complained of by the milling company were discriminatory, was bound to prescribe the maximum rate to be charged in the future for the services, but that it failed to do so, and exceeded its powers by prescribing relative rates. If the power conferred upon the commission were simply and alone to prescribe maximum rates, there would be much force in the complainants' contention. There is a marked distinction between that power and the power to fix minimum or absolute rates. There is still greater distinction between it and the power to fix relative rates; for, strictly speaking, power to prescribe the relations which shall exist between charges is not power to fix them at all. It is necessary to look further than to the power to prescribe maximum rates to find authority for the order in question. This order attempted to remove the discrimination against the milling company. It prescribed, in substance, that the charges against it should be the same as those charged other shippers for services similar in their nature. It did not prescribe how the charges should be equalized. Raising the rate to the

Western shipper would have complied with the order as well as lowering the rate to the milling company. The end to be attained was the removal of the discrimination. Now, the removal of discriminations is one of the primary purposes of the act to regulate commerce, its supplements, and amendments. Many provisions are directed to that end. Consequently it is not to the specific power to prescribe maximum rates, but to the broad powers, applicable in the case of violations of the act by unjust discriminations, conferred by section 12, "to execute and enforce the provisions of this act," and, by section 15, "to make an order that the carrier shall cease and desist from such violation to the extent to which the commission find the same to exist," that resort must be had. The complainants apparently do not question the power of the commission to order them to desist from the unjust discrimination, but they contend that the commission cannot stop there—that such determination is merely antecedent to the fixing of a new maximum rate. If this be so, the act loses much of its effectiveness. Discriminations are as well accomplished by lowering as by raising rates. If the commission had prescribed in the present order as the maximum rate the present charge to the Western millers, the same condition would be brought about by making a new and lower rate to them. We think any such construction of the act would fail to give due effect to its provisions, and that the powers conferred by section 12 and 15 furnished the commission authority to make the order in question, and did not require it to go further.

The complainants also urge under the present ground of objection that the order was invalid because it left the carriers to prescribe the regulations and practices necessary to make it effective. It is said that the commission, having made the order for the purpose of removing the discrimination, was itself bound to prescribe in detail the regulations and practices to be followed in accomplishing the desired result. If the regulations referred to in the condition of the order for making certain that only the grain of the milling company which is exported as flour takes the export flour rate are regulations and practices required in removing the discrimination, there is much force in this contention. There is no specific authority in the act under which the commission may require carriers to devise and frame regulations to make its orders effective, and specific power is only conferred upon the commission itself to make regulations and practices in lieu of those which it finds in violation of the act. Therefore the commission says that, as no regulations or practices were complained of by the milling company and none were found to violate the act, it had no power to take the initiative in prescribing regulations or practices in connection with the removal of the discrimination, and could leave the matter to the carriers. The complainants, however, say that this is a non sequitir; that, if the commission had no power to prescribe the regulations itself and no power to require the carriers to make them, it had no power to make the order in question. We think the question discussed by both parties is not quite the question presented to the court. In one aspect of this order no regulations are necessary. If the carriers raise the rate upon export flour milled in transit to equal

the present rate upon the grain of the milling company, nothing needs to be done by way of regulation. The milling in transit privilege is merely taken away. If, on the other hand, the rate upon the milling company's grain which is ground into export flour is lowered, regulations are necessary, but they are not regulations connected with the removal of the discrimination. They are regulations for the benefit of the carriers themselves, having for their object the making certain that no more grain gets the low rate than is entitled to it. The order directs the removal of the discrimination. It does not necessarily follow that any regulations are necessary to carry it out. But, if the carriers determine to remove them in a way which requires such regulations, then the condition applies that the carriers may themselves prescribe them, to be carried out at the expense of the milling company. In other words, the severity of a stringent order is relaxed. A condition is attached for the carrier's benefit. With power to make such reasonable regulations for identifying the grain as they please— all at the expense of the milling company—they can hardly complain that the order is less harsh against them than it might have been. In our opinion, the exercise of the power to remove unjust discriminations is not rendered ineffective by leaving to the carriers the right to initiate the practices to be followed to relieve them from possible mistakes or impositions in the operation of the order.

The complainant further contends that the order was invalid because it failed to correct the most serious discrimination found by the commission—that in favor of foreign millers. But the order was not rendered invalid by being less comprehensive than it might have been. If it removed one discrimination it was not inoperative because it failed to remove others. It was lawful as far as it went, even if it did not go as far as it might.

We also think the contention of the complainants without foundation that the order is invalid because it fails to conform to the decision which forms its basis. It was not absolutely necessary that it should conform. It substantially does.

It is next contended that the order is invalid because it requires the complainant to establish regulations and practices not connected with interstate transportation. The gist of this contention is that any regulation established by the carriers to make certain that the grain of the milling company upon which it receives the export flour rate is actually ground and exported is not connected with transportation, and consequently is no part of interstate commerce. It is said that, when interstate transportation is completed, the power of the commission ends—that it cannot establish regulations covering property after such transportation has terminated. The term "transportation," as defined in the interstate commerce act (section 1), includes "all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage and handling of property transported." The commission is authorized to prescribe regulations and practices in respect to transportation. Consequently it is urged in answer to the complainants' contentions that the commission, for the purpose of eliminating discriminations in transporta-

tion, may prescribe regulations with respect to the custody of grain designed for export after the railroad carriage thereof has been completed and prior to delivery upon the ship. But we are not called upon to determine the precise question thus presented. As already pointed out, the case discussed upon the briefs is not exactly the one before us. The matter in question before the commission was the discrimination in rates for railroad transportation. The commission found that the relation of rates for such transportation constituted an unjust discrimination, and ordered it to cease. The mandatory part of the order relates solely to transportation, and the object of the condition is only to protect the carriers from unjust rates for transportation service. If the discrimination complained of is removed by raising the rate upon flour milled in transit, no regulations will be necessary. If it is removed by lowering the milling company's rate, regulations will undoubtedly be necessary to protect the carriers from imposition or mistake—to make certain that only flour actually exported gets the export rate for the transportation service rendered. In our opinion the commission, in inserting in the order a condition for the carriers' benefit, cannot be said to have acted outside its province, even though the subject-matter of the condition be regarded as something subsequent to transportation. And this is the more true if the condition be regarded as only authorizing regulations for the determination of the applicability of rates for transportation.

The next objection to the validity of the order is that it is not confined to the issues raised. As already shown, the milling company specifically asked the commission to order the carriage to fix the rate upon grain which it shipped from Chicago points to New York Harbor at the same amount as was fixed upon export grain. The commission did not grant this relief, but, instead, gave the milling company the benefit of the rate upon flour milled in transit and exported. But, as the petition of the milling company also prayed for further and general relief, we should find no difficulty in sustaining the order notwithstanding this variance, if there were any facts in the petition concerning the milling in transit rate or any showing that the milling company should be placed upon the same basis as those enjoying it. But the petition contains no reference to such privilege. Indeed, the complaint seems to be regarding rates enjoyed by millers at Chicago and west thereof, instead of by those located on the carriers' lines east of Chicago and enjoying the milling in transit privilege. If this order were a judgment of a court, we should without hesitation say that the facts alleged in the petition did not support it. The Interstate Commerce Commission is, however, an administrative tribunal dealing with practical problems. So long as parties affected by its orders appear and are fully heard, we think it would be most unfortunate to deny its power to grant such relief as the facts shown upon the investigation should call for, even though such facts might be presented by evidence technically outside the issues raised. Notwithstanding, therefore, that the commission has established rules of practice analogous to those in courts, notwithstanding that its rules even provide that hearings shall be had upon issue joined, we are of the

opinion that the strict rules of pleading should not be held applicable to it. Before we declare an order of the commission invalid as being outside the issues, we think that we should be satisfied that it is outside the issues actually presented to the commission and upon which the parties were heard. We have, therefore, thought it our duty to examine the evidence and consider the claims of the parties made upon the hearing before the commission. Through such examination we find that the milling company and the carriers appeared before the commission, and that the various phases of the discriminations claimed to exist against the milling company were fully inquired into, including that claimed to exist in favor of interior millers enjoying the milling in transit privilege. As the hearing progressed, its scope apparently widened, and at its conclusion we are satisfied that the real question before the commission in the minds of all the parties was whether it was proper and practicable to afford relief like that granted by the order. Indeed, we have no doubt that should we declare this order invalid, and a new petition should be filed, the inquiry would be along the lines of the hearing already had, with, presumably, the same result. We conclude, therefore, that, while the order may have been technically outside the issues raised by the pleadings, it was still germane to the subject-matter before the commission, and should not be declared invalid.

That which has just been said is also applicable to the contention of the complainants that the order is invalid because, while the milling company made no complaint with respect to the grain product rate, the order gives it the benefit of the lower flour rate upon all its grain products. The whole subject was fully presented to the commission. If there was error or inadvertence in according to all the milling company's products the flour rate, application might perhaps be made to the commission to correct it. But we cannot hold as a matter of law that the order was rendered invalid thereby. And, in so far as the objection goes to the reasonableness of the order, we think that it should not be determined upon this application.

The final contention of the complainants is that it is impossible as a practical matter to comply with the order, and that it should be set aside as unenforceable. This objection is not strictly a legal one, but involves the reasonableness of the order. We shall not enter into a full examination of it upon this preliminary application. Indeed, the extent to which this court under the Hepburn amendment may inquire into the mere reasonableness of orders made by the commission is a most serious question. Section 15 provides that orders of the commission shall take effect and remain in force a prescribed time, unless "suspended or set aside by a court of competent jurisdiction." Under one possible construction of this provision, a court could only set aside an order when it infringed upon a constitutional right of the carrier, or failed to comply with the provisions of the statute. The objections to the validity of the present order which have already been examined illustrate these questions which the court undoubtedly has power to pass upon. On the other hand, under another possible construction of the provision, the court has power to pass upon the reasonableness

of the orders of the commission upon their merits. We notice a trend in the decisions toward the latter construction, but we deem it inexpedient to express any opinion in the matter until after final hearing. For the present it is sufficient to say that, assuming that we have the broad power of revision, we are not now satisfied from an examination of the moving papers that the order is unreasonable and impracticable. Certainly, we think that it is not so clearly impracticable that its enforcement should be suspended pending suit and without a trial of its working.

The complainants contend that a preliminary injunction should be granted because they would suffer irreparable damage if the order should be put into effect and should subsequently be held invalid. But we are unable to see how the damages of the carriers in that contingency would be any more irreparable than would be those of the milling company in case the order should be suspended, and should subsequently be held valid.

The application for a preliminary injunction is denied.

WARD, Circuit Judge (dissenting). I cannot concur in the opinion of the court because I think the order in question transcends the power of the commission. It is conceded that the charge for transporting export grain and flour should be lower than for the domestic, likewise that the milling in transit privilege is reasonable and valuable to shippers. Owing to the situation of the Hecker Mills at the seaboard, they cannot avail themselves of this privilege as shippers from the interior can. When they get their grain, the contract of the bill of lading is performed, and the transportation is at an end. The Hecker Mills can ask nothing more of the railroad; the relation of shipper and carrier having wholly ceased. It is true that compared with the shippers from interior points they are at a disadvantage in respect to grain which they determine to grind and export as flour after delivery. What the commission's order gives them is really a milling after transit is over privilege, and because this could not be given directly the order takes on the singular form of prohibiting the railroads from charging a lower rate upon flour milled in transit at interior points than is charged the Hecker Mills for grain ground into flour at New York and exported; in other words, from giving a milling in transit privilege to any shipper unless they give the same thing to the Hecker Mills. Undoubtedly uniformity of rates may be accomplished by raising as well as by lowering rates, or, in this case, by depriving the Western shippers of the milling in transit privilege. But, that privilege being accorded by the railroads as reasonable, to take it away would be quite inconsistent with the spirit and intent of the interstate commerce act. The order is sought to be justified as an exercise of the commission's power to prevent unjust discriminations, which, as I understand it, are discriminations made during transportation. But there is no discrimination against the Hecker Mills during transportation; they being properly charged the domestic rate for grain delivered to them at New York. I think discriminations cannot be

created by the shipper's change of mind as to the disposition he will make of his goods after the delivery by the railroad is complete. The motion for a preliminary injunction should be granted.