180 F.2d 28
 86 U.S.App.D.C. 102
 MANSFIELD JOURNAL CO. (FM)
v.
FEDERAL COMMUNICATIONS COMMISSION
MANSFIELD JOURNAL CO. (FM)
v.
FEDERAL COMMUNICATIONS COMMISSION (Harry, Intervenor).
LORAIN JOURNAL CO.
v.
FEDERAL COMMUNICATIONS COMMISSION.
 Nos. 10049, 10050, 10051
 United States Court of Appeals District of Columbia Circuit
 Argued Dec. 15, 1949.
Decided Jan. 23, 1950.
 
 [86 U.S.App.D.C. 105] Messrs. George O. Sutton and William Thomson, Washington, D.C. for appellants. Mr. John H. Midlen, Washington, D.C. also entered an appearance for appellants.
 Messrs. Max Goldman, Assistant General Counsel, and Richard A. Solomon, Counsel, Federal Communications Commission, Washington, D.C. with whom Mr. Benedict P. Cottone, General Counsel, and Miss Mary Jane Morris, Counsel, Federal Communications Commission, Washington, D.C. were on the brief, for appellees.
 Mr. William A. Porter, Washington, D.C. with whom Messrs, Herbert M. Bingham and Roger Robb Washington, D.C. were on the brief, for intervenor, Laurence W. Harry, t/a Fostoria Broadcasting Company, in No. 10050.
 Before WILBUR K. MILLER, WASHINGTON and BAZELON, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 The main question here presented concerns the authority of the Federal Communications Commission to review the past business practices of a newspaper company applying for a radio broadcasting license, where such practices are found to be monopolistic in character, and a license is for that reason denied.
 
 
 2
 The Mansfield Journal Company appeals from a decision of the Federal Communications Commission denying the Company's applications for licenses to construct FM (frequency modulation) and AM (amplitude modulation) radio stations in Mansfield, Ohio (No. 10049 [FM], No. 10050 [AM], and from the Commission's action in ordering the application of the Fostoria Broadcasting Company for an AM station in Fostoria, Ohio (which was mutually exclusive of the proposed Mansfield AM station), to be placed in the pending file (No. 10050). The Lorain Journal Company appeals from the Commission's denial of its application for an AM station in Lorain, Ohio (No. 10051).
 
 
 3
 We consider first the Mansfield Journal cases (Nos. 10049 and 10050). The Mansfield AM and FM applications were filed at different times, and were designated for separate hearings. The FM application was to be heard along with the requests of two other applicants for FM facilities in the same community, because only two FM frequencies were then available in that area. The AM application was to be heard along with the Fostoria and Lorain requests for licenses. After both the AM and FM hearings were completed, the Commission allocated an additional FM frequency to the area and severed the three applications for FM stations.[1] Mansfield's FM application was consolidated with the three AM applications for purposes of decision.[2]
 
 
 4
 The facts area as follows: The Mansfield Journal is the sole newspaper in the town of Mansfield, Ohio. The only other medium [86 U.S.App.D.C. 106] of mass communication in Mansfield is radio station WMAN, which is under different ownership than the newspaper and competes with it for local advertising. the Commission found that the Mansfield Journal used its position as sole newspaper in the community to coerce its advertisers to enter into exclusive advertising contracts with the newspaper and to refrain from utilizing station WMAN for advertising purposes. It did this by refusing to permit certain advertisers, who also use the radio to sell their products, to secure regular advertising contracts or to place any advertisements in the newspaper whatever. The Commission found further that Mansfield had demonstrated a marked hostility to station WMAN by declining to publish WMAN's program log and by failing to print any comments about the station unless unfavorable. The Commission concluded that such actions were taken with the intent and for the purpose of suppressing competition and of securing a monopoly of mass advertising and news dissemination, and that such practices were likely to continue and be reenforced by the acquisition of a radio station. The applications of the Mansfield Journal therefore were rejected, the Commission holding that a grant to it would be inconsistent with the public interest, and that it was unqualified.
 
 
 5
 Appellant raises several objections to this action by the Commission. First, it claims that the consideration of appellant's competitive activities as a newspaper is beyond the jurisdiction of the Commission. Appellant argues that enforcement of the antitrust laws is exclusively the province of other agencies and that the action taken by the Commission is an ultra-vires attempt to enforce these laws. Second, appellant contends that the Commission's determination is equivalent to adjudicating appellant guilty of a crime without trial by jury and thus is violative of the Sixth Amendment. Third, it is claimed that refusal of a license to appellant because it did not carry certain advertisements and would not print certain news items constitutes an invasion of the freedom of the press, in violation of the First Amendment. Appellant also alleges that the findings were capricious and not supported by the evidence, and that appellant had no notice that such matters were going to be considered. We shall consider these contentions seriatim.
 
 
 6
 In Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 137-138, 60 S.Ct. at page 439, the Supreme Court said: "In granting or withholding permits for the construction of stations, and in granting, denying, modifying or revoking licenses for the operation of stations, 'public convenience, interest, or necessity' was the touchstone for the exercise of the commission's authority. While this criterion is as concrete as the complicated factors for judgment in such a field of delegated authority permit, it serves as a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy. * * * The Communications Act, [47 U.S.C.A. § 151 et seq.] is not designed primarily as a new code for the adjustment of conflicting private rights through adjudication. Rather it expresses a desire on the part of Congress to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission."
 
 
 7
 The criterion of public convenience, interest and necessity was not intended to permit the Commission to deny licenses arbitrarily. Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406. Nor was it intended to relegate the Commission to the functions of a traffic policeman with power to consider merely the financial and technical qualifications of the applicant. National Broadcasting Co. v. United States, 319 U.S. 190, [86 U.S.App.D.C. 107] 215-216, 63 S.Ct. 997, 87 L.Ed. 1344. "An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts." Federal Communications Commission v. Sanders Radio Station, 309 U.S. 470, 475, 642, 60 S.Ct. 693, 697, 84 L.Ed. 869, 1037. "Inquiry into an applicant's character, as commonly understood would certainly be material." Mester v. United States, D.C., 70 F.Supp. 118, 122, affirmed, 332 U.S. 749, 68 S.Ct. 70, 92 L.Ed. 336; see Federal Communications Commission v. WOKO, Inc., 329 U.S. 223, 229, 67 S.Ct. 213, 91 L.Ed. 204. In fact, character is specifically set forth in the Communications Act as a relevant consideration. 47 U.S.C.A. § 308. This does not mean that the Commission may set up some capricious standard of proper behavior which must have been complied with as a prerequisite to the granting of a license. but certainly in determining whether a particular applicant should be permitted to operate so important and restricted a facility as a radio station, which reaches into the homes of so many people, it is appropriate that the Commission examine pertinent aspects of the past history of the applicant.
 
 
 8
 The Commission has determined in the instant case that it is contrary to the public interest to grant a license to a newspaper which has attempted to suppress competition in advertising and news dissemination. This would not appear to be a consideration conceived in whimsy but rather a sound application of what has long been the general policy of the United States. Congress intended that there be competition in the radio broadcasting industry. Federal Communications Commission v. Sanders Radio Station, 309 U.S. 470, 474-476, 60 S.Ct. 693, 84 L.Ed. 869. It is certainly not in the public interest that a radio station be used to achieve monopoly.
 
 
 9
 Appellant argues that this amounts to enforcement of the antitrust laws. But whether appellant has been guilty of a violation of these laws is not here in issue. The fact that a policy against monopoly has been made the subject of criminal sanction by Congress as to certain activities does not preclude an administrative agency charged with furthering the public interest from holding the general policy of Congress to be applicable to questions arising in the proper discharge of its duties. Whether Mansfield's activities do or do not amount to a positive violation of law, and neither this court nor the Federal Communications Commission is determining that question, they still may impair Mansfield's ability to serve the public. Thus, whether Mansfield's competitive practices were legal or illegal, in the strict sense, is not conclusive here. Monopoly in the mass communication of news and advertising is contrary to the public interest, even if not in terms proscribed by the antitrust laws.
 
 
 10
 It may be that appellant is contending that if the Commission's findings of fact were correct, then appellant has violated the antitrust laws, and that in such case the Commission is without jurisdiction to consider these matters. There is no merit in such a contention. It is provided in the Federal Communications Act itself that the Federal Communications Commission may refuse a license to any person who "has been finally adjudged guilty by a Federal court of unlawfully monopolizing or attempting unlawfully to monopolize, radio communication, directly or indirectly * * * or to have been using unfair methods of competition." 47 U.S.C.A. § 311. The Mansfield Journal has not been convicted of any such violation. But the statute does not for that reason place the Journal's past conduct with regard to monopoly and the antitrust laws beyond the consideration of the Commission.[3] In National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344, Mr. Justice Frankfurter, [86 U.S.App.D.C. 108] speaking in the Court, said: "by clarifying in § 311 the scope of the Commission's authority in dealing with persons convicted of violating the anti-trust laws, Congress can hardly be deemed to have limited the concept of 'public interest' so as to exclude all considerations relating to monopoly and unreasonable restraints upon commerce. Nothing in the provision or history of the Act lends support to the inference that the Commission was denied the power to refuse a license to a station not operating in the 'public interest', merely because its misconduct happened to be an unconvicted violation of the anti-trust laws." 319 U.S. at page 223, 63 S.Ct. at page 1012.
 
 
 11
 That case involved a suit by the National Broadcasting Company to enjoin enforcement by the Federal Communications Commission of the chain Broadcasting regulations which it had promulgated. Those regulations were based upon a study made by the Commission from which it concluded that certain network practices tended toward monopolization of broadcasting time and facilities, and unduly limited program content, thus impairing the ability of both affiliated and non-affiliated stations to operate in the public interest. The regulations were attacked, among other grounds, upon the theory that they were beyond the Commission's jurisdiction and were an ultra-vires attempt to enforce the anti-trust laws. The Supreme Court rejected that argument and cited with approval the Commission's report as presenting the true basis for such regulations: " 'The prohibitions of the Sherman Act [15 U.S.C.A. § 1 et seq.], apply to broadcasting. This Commission, although not charged with the duty of enforcing that law, should administer its regulatory powers with respect to broadcasting in the light of the purposes which the Sherman Act was designed to achieve. * * * While many of the network practices raise serious questions under the antitrust laws, our jurisdiction does not depend on a showing that they do in fact constitute a violation of the antitrust laws. It is not our function to apply the antitrust laws as such. It is our duty, however, to refuse licenses or renewals to any person who engages or proposes to engage in practices which will prevent either himself or other licensee or both from making the fullest use of radio facilities. This is the standard of public interest, convenience or necessity which we must apply to applications for licenses and renewals. * * * ' " 319 U.S. at page 223-224, 63 S.Ct. at page 1012.
 
 
 12
 While the instant case involves the actual denial of a license rather than the validity of general regulations, we think the reasoning of the national Broadcasting case controlling here. We hold, therefore, that it was fully within the Commission's jurisdiction to hear evidence on the alleged monopolistic practices of the appellant, regardless of whether or not such practices were specifically forbidden by statute, and to deny the licenses upon its finding that such practices had in fact taken place and were likely to carry over into the operation of the radio station.[4]
 
 
 13
 [86 U.S.App.D.C. 109] Mansfield alleges that the Commission's finding of an intent and practice of suppressing competition is equivalent to convicting the appellant of a crime, and that withholding a license on the basis of such a finding is identical to the imposition of a penalty. Thus, it is claimed that the constitutional right to a trial by jury has been denied. We believe we have made it clear that the findings of the Commission do not constitute conviction of a crime or the equivalent. The ultimate matter in question was not whether Mansfield was innocent or guilty, but whether qualified or unqualified, and the appellant's conduct was considered only in that regard. Nor does the withholding of a privilege, granted by the Government only to fully-qualified applicants, amount to a penalty, when there is sound basis for finding the applicant unfit. Federal Communications Commission v. WOKO, Inc., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204.
 
 
 14
 Appellant contends that to deny it a license because it has refused to carry the log of station WMAN, or because it has refused to permit certain people to advertise, is to impinge upon the freedom of the press. We think that the appellant misconceives the Commission's holding. The Commission did not deny the license merely because the newspaper refused to print certain items or because it refused to serve certain advertisers, but rather because the the Commission concluded that those practices were followed for the purpose of suppressing competition. Similarly, it would appear that Mansfield was not denied a license because it was a newspaper, but because it used its position as sole newspaper in the community to achieve a monopoly in advertising and news dissemination. Such a denial does not constitute a violation of the First Amendment. In Associated press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013, Mr. Justice Black said: "That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not." 326 U.S. at page 20, 65 S.Ct. at page 1424.
 
 
 15
 Just as the First Amendment does not provide the press with immunity from the commands of the antitrust laws, so a newspaper, when it stands as an applicant for a radio license, may not rely on the First Amendment to compel the Federal Communications Commission to disregard public interest in considering its application. The mere fact of newspaper ownership has been held relevant in determining the qualifications of an applicant. Plains Radio Broadcasting Co. v. Federal Communications Commission, 1949, 85 U.S.App.D.C. 48, 175 F.2d 359. Surely then the way the newspaper is operated, in relation to other media of communication, is material. The Commission did not, in any manner, attempt to censor the editorial policy of the newspaper. Its order does not require Mansfield to cease from any of the practices engaged in. The sole purpose of the Commission's findings was to determine appellant's qualifications to become a licensee. As such they impinge on no right of the appellant. Any other conclusion would mean that a newspaper could never be denied a license because of its past activities in the newspaper field, however detrimental to the public interest in the field of radio broadcasting. The mandate of the First Amendment does not preclude the Commission [86 U.S.App.D.C. 110] from considering the competitive practices of appellant. Only by keeping the dissemination of news free from monopoly can the constitutional guarantees of free speech and free press ever be fully achieved.
 
 
 16
 Appellant also argues as error that the Commission's findings of fact were capricious and unsupported by the evidence. Admittedly there was conflicting testimony by witnesses, with relative degrees of interest and disinterest in the particular controversy, as to whether the Mansfield Journal refused to enter into advertising contracts with certain commercial firms because of their use of the radio station in the town. There were also many advertisers who did use both media. But it is clear that the newspaper itself exhibited a marked degree of hostility to the radio station, refusing to carry its log or any favorable reports about the station, and that at least certain of the advertisers of the city were deprived of newspaper space for reasons connected with their use of the radio. The credibility of the witnesses who testified to such practices is, of course, a question for the Commission. We have not ignored the views expressed by the two dissenting Commissioners. but the record as a whole, including the testimony of the controlling stockholder of Mansfield, presents a substantial basis for the Commission's conclusion, and it is not the province of this court to disturb that determination.
 
 
 17
 Appellant claims that it did not have reasonable notice that newspaper ownership, the competitive practices of the newspaper, and the relationship between it and station WMAN, were to be in issue. In the designation for the AM hearing it was specifically set forth that "the policies of the applicant * * * corporations [Mansfield and Lorain] with respect to exclusive advertising contracts, and whether such policies are to be pursued in the operation of the proposed stations" were to be considered. As the applicant corporations were newspapers, as the advertising practices were conducted by Mansfield as a newspaper, and as the practices were directed at the competition offered by station WMAN, it would appear that such a designation was adequate. Further, appellant not only failed to object at the hearing to the evidence adduced by the Commission on such matters, but also introduced evidence in point. Designations for hearing, like pleadings under modern procedure, are for the purpose of reasonably apprising the party of the issues involved, and are not to be struck down for non-prejudicial deficiencies. New York Cent. & H.R.R. Co. v. Interstate Commerce Commission, C.C., 168 F. 131, 138-139; cf. N.L.R.B. v. Mackay Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. Even if the designation for the AM proceeding was not as complete as might be desired, it is clear that appellant was at all times fully aware of the matters in issue. That the commission's final decision reads in terms of monopolization of the media of mass communication and of advertising monopoly is not to take the case beyond the issued framed and heard. There may be a semantic difference, but the underlying problem was the same.
 
 
 18
 Appellant presents a stronger case with reference to the FM proceeding. For there was in that proceeding no designation of such matters for consideration. The AM hearing, however, was conducted before the FM proceeding. Appellant consented to incorporate the AM record into the FM proceeding. We think that the whole record, considered in the light of these facts, indicates that the alleged lack of notice was not prejudicial, if not actually waived. In both the AM and FM proceedings, the hearing on Mansfield's competitive practices was full and complete. Mansfield had ample opportunity, which was availed of, to present its own witnesses in support of its claim of qualification and in rebuttal of adverse testimony.
 
 
 19
 The remaining question, in the Mansfield appeals, is largely procedural in character. Mansfield objects to the Commission's order (in No. 10050) placing the application of the Fostoria Broadcasting Company, which is mutually exclusive of [86 U.S.App.D.C. 111] the Mansfield AM application, in the pending file. We do not find that Mansfield is aggrieved by the Commission's action in reference to the Fostoria application. Mansfield's application has been denied on totally independent grounds, which this court has herein sustained. The fact that Fostoria's application is mutually exclusive of Mansfield's is now immaterial. Mansfield's status has become that of a member of the general public. Simmons v. Federal Communications Commission, 79 U.S.App.D.C. 264, 145 F.2d 578.
 
 
 20
 With regard to No. 10051, in which the Lorain Journal was denied a license for an AM station: The denial was predicated on the grounds that there is a complete common ownership and common control of the Lorain and Mansfield Journals, and that the same control which cannot be intrusted with a radio station station in Lorain, as it is likely to abuse its power in either situation. While these two newspapers were separate corporations, with separate editorial staffs, and located in communities over fifty miles apart, the record shows that one family owns all of the stock in both corporations and that the owners took very active part in the control and policy formulation of the newspapers. We think the Commission was entitled to ascertain, and base its findings upon, the true locus of control. It could properly conclude that what had occurred in Mansfield was indicative of what might occur under similar circumstances in Lorain.
 
 
 21
 This is not to disregard the fact that the two newspaper companies conduct separate businesses. It is rather to recognize that the true applicant in each of these cases is the same individual, or group of individuals, and that the Commission is empowered to consider the conduct and history of the applicant before deciding to grant the benefits represented by a broadcasting license. The Commission, in the words of Chief Justice Marshall, is entitled to "look beyond the corporate name, and notice the character of the individual." Bank of the United States v. Deveaux, 1809, 5 Cranch 61 at page 90, 3 L.Ed. 28. to carry out statutory objectives, it is frequently necessary to seek out and give weight to the identity and characteristics of the controlling officers and stockholders of a corporation. Daimler, Ltd. v. Continental Tyre & Rubber Co. (Great Britian), Ltd. [1916], 2 A.C. 307; Cherry Cotton Mills, Inc., v. United States, 327 U.S. 536, 66 S.Ct. 729, 90 L.ed. 835; Consolidated Realty Co. v. Dyers, Finishers & Bleachers Federation, 137 N.J.Eq. 413, 45 A.2d 132; cf. Federal Communications Commission v. WOKO, Inc., supra; McCaskill Co. v. United States, 216 U.S. 504, 514, 515, 30 S.Ct. 386, 54 L.Ed. 590; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.ed. 281; United States v. Hare, 7 Cir., 153 F.2d 816, certiorari denied 328 U.S. 836, 66 S.Ct. 983, 90 L.Ed. 1612. In the present situation the problem before the Commission is not whether the two newspaper companies constitute separate entities; it is rather a question of the probable conduct of the applicants as licensees. The Commission's considered opinion as to that probable conduct appears to us based on sufficient evidence. This court will not disturb it.
 
 
 22
 Other objections raised (in No. 10051) by appellant Lorain Journal are identical to those raised by the Mansfield Journal and must be disposed of on the same basis.
 
 
 23
 Upon examination of the record we find no reversible error. The decisions of the Federal Communications Commission in all three cases are therefore
 
 
 24
 Affirmed.
 
 
 
 [1]
 Mansfield originally objected to the severance order in the FM proceedings, but since both the other FM applicants have voluntarily cancelled and abandoned their construction permits, that issue is moot
 
 
 [2]
 Objection is made in three cases, by the appellants, to the consolidation within the Commission of the Lorain, Mansfield and Fostoria AM applications with the Mansfield FM application for the purpose of final argument and determination. The basis of consolidation is convenience in hearing related to issues. Since all three applications presented common or related questions of fact and law, as will appear in this opinion, consolidation was conducive to workable administration, and we find that it was not prejudicial. Cf. United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821; Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656
 
 
 [3]
 "an inquiry which concerned itself only with convictions for felony or of crimes involving moral turpitude would be grossly inadequate. It might indeed be most inadvisable from the public viewpoint to entrust the operation of a radio station to a person unworthy of belief and evidencing disregard for regulatory laws, even through he had never been convicted of a felony." Mester v. United States, supra [70 F.Supp. 122]
 
 
 [4]
 In Southern Steamship Co. v. National Labor Relations Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246, the Supreme Court, in a five-four decision, reversed an order of the NLRB which required an employer who had discharged certain seamen for labor activities to reinstate those men. The Board had found that the seamen had violated the mutiny laws, but exercising what it believed to be its discretion, ordered reinstatement. The Supreme court in holding that the reinstatement order was improper, said:
 "It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task." 316 U.S. at page 47, 62 S.Ct. at page 894.
 The four dissenting Justices agreed that such accommodation was necessary, dissenting on the ground that the Board had discretion in such instances and that it had not been abused in the case presented. Apparently all nine Justices agreed that congressional policies other than those expressed in the Labor Relations Act, 29 U.S.C.A. § 151 et seq., were not only permissible considerations but highly material to the Board's determination of cases before it.