CAPITAL TELEPHONE COMPANY, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

Boris and Annette F. Squire, d/b/a Air Page, Intervenor.

No. 72–1715.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1973.

Decided May 24, 1974.

Henry A. Solomon, Washington, D. C., for appellant.

Gregory M. Christopher, Counsel, F. C. C., with whom John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, F. C. C., were on the brief for appellee.

Jeremiah Courtney and Arthur Blooston, Washington, D. C., were on the brief for intervenor.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

Capital Telephone Co. (Capital) appeals from a decision of the Federal Communications Commission (the Commission) denying its application for authority to construct and operate a one-way radio paging station at Albany, New York. Capital contends that the Commission's action deprived it of a comparative hearing in violation of its statutory right. We find the Commission's action to be in accord with the governing statute and therefore affirm its decision.

## I

Albany, Schenectady and Troy (the A–S–T area) are three cities in upstate New York located in close proximity of each other.[1] Following the Commission's allocation of two high-band radio channels (152.24 and 158.70 MHz) for one-way paging service by communications common carriers,[2] four carriers applied for these channels in the A–S–T area. Peter Bakal filed an application requesting 152.24 MHz at Schenectady. Appellant Capital, a corporation wholly owned by Bakal, requested 158.70 MHz at Albany, and intervenor Air Page applied for the same frequency (158.70 MHz) at Troy. A fourth applicant, Pattersonville Telephone Co., also filed an application for 152.24 MHz to operate from Rotterdam Junction about 10 miles from Schenectady. All these applications were considered by the Commission at the same time to assure that no applicant would get a "head start" in this new field of high-band paging.[3]

Capital is a corporation wholly owned by Bakal who is also its president. Although Bakal has a transmitter located in Schenectady and Capital has a transmitter in Albany, both transmitters are operated from Bakal's central control and switchboard in Schenectady. The Commission noted that Bakal had applied for 152.24 MHz at Schenectady, that Capital had applied for 158.70 MHz at Albany, and that these two applicants were "affiliated in ownership and management." [4]

The Commission recognized the injustice that would be done to Air Page if both the Bakal and capital applications were granted. This would, in effect, grant to one individual the use of all the most desirable available high-band paging channels in the A–S–T area and leave Air Page to attempt to compete in the same area with the less desirable low-band channel it was then operating. In this situation, to conform to what it considered to be a fair and equitable distribution of the available frequencies, the Commission took cognizance of the identity of interest between Bakal and Capital and pierced the corporate veil of Capital. This resulted in Bakal and Capital being considered as one applicant. Accordingly the Commission conditionally granted Bakal's personal application (for 152.24 MHz at Schenectady) pursuant to 47 C.F.R. 21.29,[5] denied Capital's

---

1. Schenectady is about 13 miles northwest of Albany; Troy is about 6 miles northeast of Albany.

2. This form of service is described in Radio Relay Corp. v. United States, 409 F.2d 322, 324 (2d Cir. 1969).

3. *See* Mobile Radio Communications, Inc., 29 F.C.C.2d 62, 64 (1971).

4. The Commission has always known that they are, *inter alia,* affiliated in ownership and management and share a downtown Schenectady office from which their separate transmitters are controlled by means of separately maintained control circuits.[3]
    3. Bakal controls his transmitters by leased lines. Capital was recently authorized to control its transmitters by radio. Brief for Appellant at 5.
    [T]he Capital application states that the proposed one-way signalling station would have been controlled—with Bakal and Capital's other facilities in the Albany-Schnectady-Troy area—from a common control point at 611 Union Street, Schenectady, where there would be a shared use of switchboards and operators, as well as three service maintenance personnel (FCC File No. 2771–C2–P–69. Amendment filed December 23, 1971).
    Pattersonville Tel. Co., 35 F.C.C.2d at 746–47.

5. 47 C.F.R. 21.29 provides:
    Where the Commission, without a hearing, grants any application in part, or with any privileges, terms, or conditions other than those requested, or subject to any interference that may result to the station if a designated application or applications are subsequently granted, the applicant will be informed of the reasons for such action and the action of the Commission shall be considered as a grant of such application unless the applicant shall, within 20 days from the date on which public announcement of such grant is made, or from its effective date if a later date is specified, return the instrument of authorization and file with the Commission a written statement rejecting the grant as made and setting forth the reasons why the application should be

application (for 158.70 MHz at Albany) and granted Air Page's application (for 158.70 MHz at Troy). Pattersonville Tel. Co., 34 F.C.C.2d 258 (1972). In doing so the Commission stated:

> We believe that it would not be either fair or realistic if we were to close our eyes to the relationship between the Bakal and Capital applications. [A] comparative hearing between Capital and Air Page for the 158.70 MHz frequency would serve no useful purpose, in our view, because as a matter of policy we would consider it *inequitable* for Dr. Bakal to be licensed to both 152.24 MHz and 158.70 MHz while Air Page, a qualified applicant, would be limited to operating on a technically inferior frequency in the 35 MHz band in the same general area.

34 F.C.C.2d at 262 (emphasis added). The Commission found that this disposition of the channels along with the operation of the Pattersonville frequency, which it also granted, would provide effective service and competition in the area, and precedent for its action was found in the Commission's earlier decision in Mobile Radio Communications, Inc., 29 F.C.C.2d 62 (1971).[6] In its decision denying Capital's petition for reconsideration[7] the Commission pointed out the Capital/Bakal application had not justified a need for both scarce channels "particularly in the face of a competing request from a qualified licensee for one of those channels" and that piercing the corporate veil and applying 47 C.F.R. 21.29 to the partial grant of Bakal's application did not violate the well known strictures of Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).[8]

II

■ The Communications Act of 1934, as amended, specifies the standards the Commission shall apply in granting licenses:

> In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as *to provide a fair, efficient, and equitable distribution of radio service to each of the same.*

47 U.S.C. § 307(b) (1970) (emphasis added). We find that the Commission, in conforming to this statutory admonition "to provide a fair, efficient, and equitable distribution of radio service," validly exercised its discretion in piercing the corporate veil of Capital, in treating Bakal and Capital as one applicant, and in only partially granting their two applications.

■■ The broad equitable standards of the statute, enacted to further public convenience, clearly support the Commission's decision to look beyond the corporate entity to serve the interests of fairness, justice and equity. By directing the Commission to provide a fair and equitable distribution of radio service, the statute protects both the general public and other broadcasters. It would do violence to the statutory command to grant both desirable frequencies to a single commonly controlled enterprise having only one real owner and manager and yet compel another qualified applicant to broadcast on a much less satisfactory channel. This decision is merely an application of the *Mobile Radio* doctrine

---

granted as originally requested. Upon receipt of such statement, the Commission will vacate its original action upon the application and reconsider the same. Upon such reconsideration, it will either grant or set the application for hearing in the same manner as other applications are set for hearing.

6. 34 F.C.C.2d at 261, 262; *see* note 9 *infra* and accompanying text.

7. Pattersonville Tel. Co., 35 F.C.C.2d 745 (1972).

8. *Id.* at 746–747.

which directs that where one applicant desires both of two available frequencies and another qualified applicant is available, the Commission will grant one frequency to each applicant as a matter of sound policy.[9]

■ The courts have consistently recognized that a corporate entity may be disregarded in the interests of public convenience, fairness and equity. E. g., Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669 (1939); Chicago Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 500–501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918); Francis O. Day Co. v. Shapiro, 105 U.S. App.D.C. 392, 396–397, 267 F.2d 669, 673–674 (1959). The general rule was stated in United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (C.C.E.D.Wis.1905), as follows:

> If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.

Capital contends that it was improper to treat it as Bakal's alter ego because the prerequisites for piercing the corporate veil are not satisfied by the facts of this case. However, we need not pause to consider whether Capital would be Bakal's alter ego under the strict standards of the common law alter ego doctrine which would apply in a tort or contract action. The contest in this case is over a license in a regulated industry and the applicable standard appears in the statute, not in court decisions involv-

ing civil suits. See, e. g., General Tel. Co. v. United States, 449 F.2d 846, 855 (5th Cir. 1971); [10] H. P. Lambert Co. v. Secretary of Treasury, 354 F.2d 819, 822 (1st Cir. 1965); [11] Mansfield Journal Co. (FM) v. FCC, 86 U.S.App.D.C. 102, 111, 180 F.2d 28, 37 (1950); Central & Southern Motor Freight Tariff Ass'n v. United States, 273 F.Supp. 823, 831–832 (D.Del.1967). In the *Central & Southern* decision, *supra,* the court stated:

> This Court finds the Commission's treatment of the wholly-owned consolidator issue inadequate. . . . What is disturbing is the mechanistic, metaphysical incantation of the doctrinal bar of the corporate veil. Such doctrines lose much of their sacrosanctity when urged in the context of regulated industries. The fact that a subsidiary corporation exists should be a starting point for searching inquiry, not the finish line.

273 F.Supp. 831–832.

In our *Mansfield Journal* decision, *supra,* two newspapers owned and controlled by the same family applied for radio broadcasting licenses in nearby towns. The FCC denied one application on the ground that the applicant's past monopolistic practices were contrary to the public interest. In denying the other application, the FCC looked beyond the corporate name and took cognizance of the identity of ownership and control between the two corporations. Affirming the FCC's authority to pierce the corporate veil in carrying out the statutory objectives, the court stated:

> While these two newspapers were separate corporations, with separate editorial staffs, and located in communities over fifty miles apart, the record shows that one family owns all of the stock in both corporations and that the owners took very active part in

9. Mobile Radio Communications, Inc., 29 F. C.C.2d 62 (1971).

10. Where the statutory purpose could be easily frustrated through the use of separate corporate entities a regulatory commission is entitled to look through corporate entities and treat the separate entities as one for purposes of regulation. 449 F.2d at 855.

11. "[T]he fiction of the corporate entity cannot stand athwart sound regulatory procedure." 354 F.2d at 822.

the control and policy formulation of the newspapers. We think the Commission was entitled to ascertain, and base its findings upon, the true locus of control.

\* \* \* \* \* \*

This is not to disregard the fact that the two newspaper companies conduct separate businesses. It is rather to recognize that the true applicant in each of these cases is the same individual, or group of individuals, and that the Commission is empowered to consider the conduct and history of the applicant before deciding to grant the benefits represented by a broadcasting license. The Commission, in the words of Chief Justice Marshall, is entitled to "look beyond the corporate name, and notice the character of the individual." Bank of the United States v. Deveaux, 1809, 5 Cranch [9 U.S.] 61 at page 90, 3 L.Ed. 38. To carry out statutory objectives, it is frequently necessary to seek out and give weight to the identity and characteristics of the controlling officers and stockholders of a corporation. [Citations follow.]

86 U.S.App.D.C. at 111, 180 F.2d at 37.

■ In the present case Capital is wholly owned by one individual who is also the president and manager of the corporation. This same individual operates and controls from the same office another business that is substantially identical to Capital's. We find that substantial evidence supports the Commission's decision to pierce Capital's corporate veil in order to carry out the statutory mandate "to provide a fair, effi-cient, and equitable distribution of radio service." [12]

### III

■ Without denying that it is essentially a single applicant in conjunction with Bakal, Capital contends that Albany is a separate and distinct communications market from Schenectady where Bakal received his requested paging frequency. However, the Commission noted that the Bakal transmitter should cover the entire A–S–T area "completely and adequately" and further stated that if for some unforeseen reason any part of that area does not receive "adequate service" from Bakal's transmitter, he could apply for authority to add additional transmitters to reach any deficient area.[13] Thus the Commission has assured Bakal and Capital of effective area-wide service.

Capital also asserts that under *Ashbacker, supra,* it was entitled to a comparative evidentiary hearing with Air Page on their mutually exclusive applications for the 158.70 MHz channel within the A–S–T area. As a practical matter Capital was afforded the opportunity for such a hearing but elected not to accept it. Under the Commission's regulation, 47 C.F.R. 21.29,[14] when the Commission treated the Bakal and Capital applications as a single application and granted it in part, Bakal had two choices. He had the right (1) to accept without a hearing the grant of channel 152.24 MHz and the denial of Capital's application, or (2) within 20 days to reject the partial grant and exercise his right to an evidentiary hearing on both

---

12. 47 U.S.C. § 307(b) (1970).

13. The Bakal transmitter located northwest of Schenectady should cover the cities of Albany, Schenectady, and Troy completely and adequately. If, however, it should turn out that for some unforeseen reason some part of that area was not receiving adequate service from that transmitter, Bakal can apply for authority to add an additional transmitter, or transmitters, op-erating on the same frequency, to improve the signal strength in particular parts of his service area. In sum, then, we are of the view that Bakal has made no showing of a need for two one-way signalling channels, particularly in the face of a competing request from a qualified licensee for one of those channels.
35 F.C.C.2d at 747.

14. Note 5 *supra.*

channels. Faced with these choices, Bakal elected to accept, without a hearing, the grant of channel 152.24 MHz. Now that such grant has become final, he attempts through Capital to ignore the condition upon which he received channel 152.24 MHz and to claim a right to a comparative hearing on channel 158.70 MHz which was granted to Air Page in the consolidated proceeding. The Commission commented upon Capital's argument as follows:

> Bakal appears to want the best of both worlds: he wants to retain the one channel that he received without a hearing as a result of the partial grant, and he also wants a comparative hearing with Air Page for the second channel. To accede to Bakal's request and grant a comparative hearing in which Capital and Air Page would contest for the single remaining high band VHF channel in the Schenectady area would be most unfair to Air Page, and we reject it.

35 F.C.C.2d at 747. A comparative hearing would have been futile because, as we point out in Part II, the Capital/Bakal combination already has one frequency that will "completely and adequately" cover the A–S–T area, and Air Page was entitled to the license under the statutory standards of equity and fairness.

■■ The condition imposed by the Commission's regulation, 47 C.F.R. 21.-29, accords with both law and logic. When an applicant accepts a government permit which is subject to certain conditions, he cannot later assert alleged rights which the permit required him to surrender in order to receive it. See Rome Ry. & Light Co. v. Floyd County, 243 U.S. 257, 37 S.Ct. 291, 61 L.Ed. 706 (1917); American Bond & Mortgage Co. v. United States, 52 F.2d 318, 321 (7th Cir. 1931). See generally Buck v. Kuykendall, 267 U.S. 307, 316–317, 45 S.Ct. 324, 69 L.Ed. 623 (1925); Brennan v. Udall, 379 F.2d 803, 807–808 (10th Cir.), cert. denied, 389 U.S. 975, 88 S.Ct. 477, 19 L.Ed.2d 468 (1967); Beloit Broadcasters, Inc. v. FCC, 125 U.S.App.D.C. 29, 31, 365 F.2d 962, 964 (1966); Gray v. Commodity Credit Corp., 63 F.Supp. 386, 397–398 & nn. 21, 22 (S.D.Cal.1945). In view of the Commission's valid treatment of Bakal and Capital as a single applicant, the regulation properly precluded them from accepting the benefits of the grant and at the same time denying the conditions upon which it was made. If Capital/Bakal wished to challenge the conditions of the partial grant, they were required to do so within the 20-day period before the grant became final.[15] The original grant to Bakal was clearly conditional under the regulation, and by accepting the grant, Bakal precluded himself and Capital from treating it as unconditional.

Capital/Bakal's challenge also represents an attempt to avoid the Commission's "head start" policy.[16] By going ahead with the 152.24 MHz operation throughout the A–S–T area while Air Page is tied up in a lengthy comparative hearing, Capital/Bakal would be operating without any competition from the 158.70 MHz channel. To allow Capital/Bakal to have this "head start," estimated at about two years, would be an inequity to Air Page and a disservice to the public interest.

For the foregoing reasons, we affirm the decision of the Commission.

Judgment accordingly.

15. That is, before 20 days passed from the date of the issuance of the grant. 47 C.F.R. 21.29; note 5 supra.

16. Note 3 supra and accompanying text.