**MCI TELECOMMUNICATIONS CORPORATION, Plaintiff,**

v.

**O'BRIEN MARKETING, INC., Defendant,**

and

**Taleigh Corporation, Impleaded Defendant in Proceedings Supplementary.**

**No. 91–8807–Civ.**

United States District Court, S.D. Florida.

Sept. 5, 1995.

Stephen J. Easley, MCI Telecommunications Corporation, Washington, DC, Hugh J. Turner, Jr., English, McCaughan & O'Bryan, P.A., Fort Lauderdale, FL, for plaintiff.

No appearances for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PROCEEDINGS SUPPLEMENTARY

HIGHSMITH, District Judge.

THIS CAUSE came before the Court for evidentiary hearing, held on August 10, 1995, on proceedings supplementary instituted pursuant to *Fed.R.Civ.P.* 69(a) and *Fla.Stat.* § 56.29. Having received documentary and testimonial evidence, having heard arguments of counsel, and being otherwise fully advised in the premises, the Court makes its findings of fact and publishes its conclusions of law.

### PROCEDURAL BACKGROUND

Plaintiff MCI Telecommunications Corporation ("MCI") commenced this action in December, 1991. MCI sought to recover unpaid charges for interstate telecommunication services provided to Defendant, O'Brien Marketing, Inc. ("O'Brien"), under the terms and conditions of MCI's Tariff No. 1, on file with the Federal Communications Commission ("FCC"), pursuant to the Communications Act of 1934, 47 U.S.C. §§ 151–612. The case was tried by the Court without a jury. On April 28, 1993, the Court entered Final Judgment in favor of MCI and against O'Brien, in the amount of $62,754.85. Subsequently, on April 21, 1994, the Court entered Final Judgment on Attorney's Fees and Costs in favor of MCI and against O'Brien, in the amount of $18,924.16.

By order dated April 26, 1995, the Court granted MCI's motion to institute proceedings supplementary, pursuant to *Fed. R.Civ.P.* 69(a) and *Fla.Stat.* § 56.29, and required Taleigh Corporation ("Taleigh") to show cause why it should not be impleaded as a party to the proceedings supplementary, as the alter ego of O'Brien. On June 19, 1995, upon Taleigh's failure to respond to the Court's show cause order, the Court entered an order impleading Taleigh as a party to the proceedings supplementary and setting an evidentiary hearing for the purpose of establishing the propriety of entering judgment against Taleigh, as the alter ego of O'Brien, in the amounts prescribed in the Final Judgment and the Final Judgment on Attorney's Fees and Costs, as well as for reasonable fees and costs incident to the proceedings supplementary. As directed in the Court's Order Impleading Taleigh Corporation and Setting Evidentiary Hearing, dated June 19, 1995, and Order Resetting Evidentiary Hearing, dated June 27, 1995, MCI provided notice of these proceedings to Taleigh at its last known address. Taleigh did not appear at the hearing.

## PROCEEDINGS SUPPLEMENTARY

Federal Rule of Civil Procedure 69(a) provides, in pertinent part: "The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable." The "practice and procedure" for proceedings supplementary in the State of Florida is set forth in Fla.Stat. § 56.29, which provides, in pertinent part:

(1) When any sheriff holds an unsatisfied execution, the plaintiff in execution may file an affidavit so stating and that the execution is valid and outstanding and thereupon is entitled to these proceedings supplementary to execution.

(2) On such plaintiff's motion, the court shall require the defendant in execution to appear before it or a master at a time and place specified by the order in the county of the defendant's residence to be examined concerning his property.

(3) The order shall be served in a reasonable time before the date of the examination in the manner provided for service of summons or may be served on such defendant or his attorney as provided for service of papers in the rules of civil procedure.

(4) Testimony shall be under oath, shall be comprehensive and cover all matters and things pertaining to the business and financial interest of defendant which may tend to show what property he has and its location. Any testimony tending directly or indirectly to aid in satisfying the execution is admissible. A corporation must attend and answer by an officer who may be specified in the order. Examination of witnesses shall be as at trial and any party may call other witnesses.

.    .    .    .    .

(9) The court may enter any orders required to carry out the purpose of this section to subject property or property rights of any defendant to execution.

(10) Any person failing to obey any order issued under this section by a judge or master or to attend in response to a subpoena served on him may be held in contempt.

(11) Costs for proceedings supplementary shall be taxed against the defendant as well as all other incidental costs determined to be reasonable and just by the court including, but not limited to, docketing the execution, sheriff's service fees, and court reporter's fees. Reasonable attorney's fees maybe taxed against the defendant.

*Fla.Stat.Ann.* § 56.29 (West 1994).

The provisions of section 56.29 are "intended to afford to a judgment creditor the most complete relief possible in satisfying his judgment" without the necessity of initiating a separate action. *Regent Bank v. Woodcox*, 636 So.2d 885, 886 (Fla. 4th DCA 1994). The two prerequisites to institution of proceedings supplementary are: (1) the sheriff holds an unsatisfied execution; and (2) the

judgment creditor files an affidavit so stating and that the execution is valid and outstanding. *Standard Property Inv. Trust v. Luskin*, 585 So.2d 1099, 1101–02 (Fla. 4th DCA 1991); *Wieczoreck v. H & H Builders, Inc.*, 450 So.2d 867, 871 (Fla. 5th DCA 1984). Compliance with these requirements also provides the predicate for impleading any named third parties to the proceedings supplementary. *Regent Bank*, 636 So.2d at 886; *Wieczoreck*, 450 So.2d at 871.

MCI established by affidavit testimony that its writ of execution on the final judgment and final judgment on attorney's fees and costs rendered in this action against O'Brien is valid and outstanding. Moreover, Taleigh did not respond to the Court's order to show cause why it should not be impleaded as a party to the proceedings supplementary, as the alter ego of O'Brien. Therefore, the Court's April 26, 1995 Order, granting MCI's motion to institute proceedings supplementary, and the Court's June 19, 1995 Order, impleading Taleigh as a party to the proceedings supplementary, are proper under *Fed. R.Civ.P.* 69(a) and *Fla.Stat.* § 56.29.

■ In conducting proceedings supplementary pursuant to section 56.29, a court has the power to direct an inquiry into the corporate entity of the judgment debtor and to issue orders in accordance with its findings in that regard. *Riley v. Fatt*, 47 So.2d 769, 772–73 (Fla.1950). Where the evidence so warrants, the court may order that the corporate veil be pierced and that the corporation's alter ego be made liable for the judgment. *See* Charles C. Kline, *Collection Pursuant to Florida's Supplementary Proceedings In Aid of Execution*, 25 U.Miami L.Rev. 596, 620 (1971) (and cases cited therein).

## APPLICABILITY OF FEDERAL LAW TO THE ISSUE OF PIERCING THE CORPORATE VEIL IN THESE PROCEEDINGS SUPPLEMENTARY

■ "The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Preemption occurs, *inter alia*, "when it is clear, despite the absence of explicit preemptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby left no room for the States to supplement federal law." *Capital Cities Cable v. Crisp*, 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984). The United States Supreme Court has recognized that the Communications Act of 1934 "is a comprehensive scheme for the regulation of interstate communications." *Benanti v. United States*, 355 U.S. 96, 104, 78 S.Ct. 155, 159, 2 L.Ed.2d 126 (1957). As a result of the Act's comprehensive regulatory scheme, "the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law," and "the states are precluded from acting in this area." *Ivy Broadcasting Co. v. American Tel. & Tel Co.*, 391 F.2d 486, 491 (2d Cir.1968).

■ Moreover, tariffs filed with the F.C.C. pursuant to the Communications Act "conclusively and exclusively control the rights and liabilities between a carrier and its customer." *MCI Telecommunications Corp. v. Graham*, 7 F.3d 477, 479 (6th Cir.1993).[1] Such tariffs "are not mere contracts, but rather have the force of law." *Human Resources Admin.*, 833 F.Supp. at 970.[2] Therefore, "[t]he duty to pay a certain price for phone service is a federal obligation." *Graham*, 7 F.3d at 479.

■ As the foregoing cases indicate, federal law completely occupies the field of interstate communications, thereby preempting state law. Moreover, the payment of tariff charges is a duty imposed by federal law.

---

1. *See also American Tel. & Tel. Co. v. New York City Human Resources Admin.*, 833 F.Supp. 962, 970 (S.D.N.Y.1993) ("[T]ariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties."); *American Tel. & Tel. Co. v. Florida–Texas Freight Inc.*, 357 F.Supp. 977, 979 (S.D.Fla.), *aff'd*, 485 F.2d 1390 (5th Cir.1973) (same).

2. *See also MCI Telecommunications Corp. v. Garden State Inv. Corp.*, 981 F.2d 385, 387 (8th Cir.1992) (same).

Therefore, the Court concludes that federal common law, rather than state law, applies to the issue of piercing the corporate veil in these proceedings supplementary to execution of final judgments for unpaid tariff charges and related attorney's fees and costs.

## THE FEDERAL COMMON LAW STANDARD FOR PIERCING THE CORPORATE VEIL

■ "Where neither the Communications Act itself nor the tariffs filed pursuant to the Act deals with a particular question, the courts are to apply a uniform rule of federal common law." *Ivy Broadcasting*, 391 F.2d at 491. The federal common law alter ego rule requires that three elements be proved in order to pierce the corporate veil:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*United Steelworkers of America, AFL–CIO–CLC v. Connors Steel Co.*, 855 F.2d 1499, 1506 (11th Cir.1988), *cert. denied*, 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989) (quoting *United Paperworkers Int'l Union v. Penntech Papers*, 439 F.Supp. 610, 618 (D.Me.1977), *aff'd*, 583 F.2d 33 (1st Cir. 1978)). Additional factors to be considered in making such an inquiry include: disregard of corporate formalities; and inadequate corporate capitalization. *See generally*, William

M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10 (1990). Notwithstanding these requirements, "the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974) (citations omitted).[3]

■ Thus,

The general rule adopted in federal cases is that a corporate entity may be disregarded in the interests of public convenience, fairness and equity. In applying this rule federal courts will look closely at the purpose of the federal statute [involved] to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine.

*Alman v. Danin*, 801 F.2d 1, 3 (1st Cir.1986) (quoting *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981)).

## PIERCING THE CORPORATE VEIL OF O'BRIEN

### I. Factual findings

At the hearing on proceedings supplementary, the Court received into evidence the deposition testimony of William J. Santamaria, O'Brien's sole shareholder; the deposition testimony of Jeff Daly, a former employee of O'Brien; the testimony of MCI's expert forensic accountant Timothy Dragelin; and MCI's exhibits # 1–9, including the following specific documents:

i.    Copies of certain bank statements, checks, deposit slips and check register for O'Brien for the years 1990 through 1993;

ii.   Copies of certain Taleigh checks for the years 1990 through 1993;

iii.  Copies of O'Brien Income Tax Returns for the years 1990 through 1993;

**3.** *See also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 630, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983) (The United States Supreme Court "has consistently refused to give effect to the corporate form where it is interposed to defeat legislative poli-

cies."); *Anderson v. Abbott*, 321 U.S. 349, 362–63, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944) ("It has often been held that the interposition of a corporation will not be allowed to defeat a legislative policy, whether that was the aim or only the result of the arrangement.").

iv. Articles and Amendments to the Articles of Incorporation of O'Brien;

v. Invoices from various third parties to O'Brien;

vi. Certain documents relating to O'Brien's premises lease; and

vii. Summaries and reports prepared by MCI's expert.[4]

Based upon its consideration of this evidence, the Court makes the following findings of fact.

1. The sole officer, shareholder and director of both O'Brien and Taleigh is William J. Santamaria. Santamaria had total and complete control over the operations of both companies. As Santamaria admitted in his deposition, with respect to these companies, he was "everything." Santamaria also admitted that he made all of O'Brien's business decisions, even with respect to "what to pay and what not to pay."

2. O'Brien was formed in 1990 to provide telemarketing services and ceased doing business some time in 1993.[5] All revenues received by O'Brien came from Taleigh or related companies. No sales invoices or other evidence provide a predicate for such revenues. Moreover, several of the deposit transactions, which were labelled "transfers" by O'Brien in the original source documents, were classified as "revenues" in O'Brien's tax returns.

3. Many of the deposits of Taleigh funds (and funds from related companies) into O'Brien's account closely matched, in amount and timing, certain disbursements made by O'Brien. Absent such deposits, O'Brien would have been unable to pay its bills. The Court concludes that essentially all payments and transfers from Taleigh (and related companies) to O'Brien were made for the purpose of enabling O'Brien to pay bills as they came due.

4. Due to the absence of documentation concerning the provision of telemarketing services by O'Brien to Taleigh (and related companies), the Court finds that payments by Taleigh (and related companies) to O'Brien did not constitute arms-length transactions.

5. O'Brien's tax returns indicate that O'Brien was on an accrual basis of accounting. However, O'Brien had little or no accounts receivable or accounts payable. If O'Brien had been invoicing Taleigh for services rendered, such accruals should have been reflected in periodic accounts receivable balances.

6. Loans between O'Brien and related entities were not documented. There is no loan agreement documentation, no evidence that interest was charged on the loans, and no repayment schedule. According to O'Brien's 1991 tax return, O'Brien had outstanding loans to its shareholder, William J. Santamaria, totalling $78,231 at the beginning of the tax year, and $7,008 at the end. Most of the payments reducing this indebtedness, however, went to Santamaria's wife, Susana. Furthermore, it is clear from the timing of some of these loan payments that their primary purpose was to drain all assets from O'Brien to benefit William Santamaria and frustrate creditors, including MCI.

7. No corporate minutes or related corporate records were kept by O'Brien nor is there any indication that board meetings were ever held.

8. At his deposition, Jeff Daly testified that he received his pay checks from O'Brien. O'Brien's records, however, show no expenditures for payroll or fringe benefits. Moreover, O'Brien incurred no expenses for insurance, utilities or equipment rentals.

9. In the absence of such operating expenses, which would be expected for a telemarketing company, the Court finds that O'Brien was not a separate company, but rather an instrumentality of Taleigh, which in fact incurred such expenses on O'Brien's behalf.

---

4. The expert's summaries were admitted pursuant to *Fed.R.Evid.* 1006. MCI brought to the hearing the voluminous materials upon which the expert's summaries were predicated. The Court instructed MCI to maintain custody of these materials.

5. As of early 1994, however, O'Brien was still maintaining a bank account.

10. Although O'Brien's records show a rent payment of $24,000.00 made on February 28, 1993, representing the total rent due in 1992, the Court finds that this payment was a sham. The lease supporting this payment lacks even the most basic indicia of reliability, such as a date. The rent payment was made on a Sunday, in a lump sum, after the expiration of the lease period, rather than monthly $2,000 advance payments, as called for in the lease. In addition, the rent payment was made to a corporation that was 100% controlled by Santamaria.

11. The amount of the rent payment, $24,000, was almost precisely the same amount of a returned security deposit, which was deposited into O'Brien's account the day after the rent payment was issued. Moreover, the rent payment, together with a payment for "accounting services" made on the same day, effectively drained O'Brien's sole asset—its bank account, shortly before the trial of this action in April, 1993.

12. O'Brien owned no real or personal property, and did not rent any assets or equipment. An independent on-going telemarketing business would have either owned or rented telemarketing equipment (such as telephones).

13. O'Brien maintained approximately $3,000 in cash and $500 in paid-in capital, an amount clearly less than adequate to fund this corporation's capital needs, based on the sales volume reported in its tax return. The Court credits MCI's expert's testimony that an appropriate capitalization would have been $25,000 to $60,000, and that the $500 paid-in capital represents only one to two percent of appropriate capitalization.

14. Based on the foregoing specific findings, the Court concludes that Santamaria and Taleigh exercised complete domination and total control over O'Brien; that there was a complete and total disregard for corporate formalities on O'Brien's part; and that O'Brien was grossly undercapitalized. O'Brien had a significant outstanding debt to its sole shareholder, but owned no real or personal property. Moreover, deposits made into O'Brien by Taleigh were solely for the purpose of covering O'Brien's disbursements.

15. The Court further finds that the structuring of O'Brien as a mere conduit for funds controlled by Taleigh and Santamaria, without underlying capitalization, enabled O'Brien to commit fraud upon its creditors, such as MCI. Moreover, in the specific case of MCI, Taleigh and Santamaria's control of O'Brien permitted O'Brien to evade its legal duty to pay tariff charges for telecommunications services provided by MCI.

## II. Conclusions of law

Based on the foregoing factual findings, the Court concludes that MCI has proved the three elements of control, fraud, and proximate cause required for piercing the corporate veil under the federal common law alter ego rule. The Court has found that Taleigh and Santamaria exercised complete domination, not only of finances, but of policy and business practices with respect to all of O'Brien's transactions, including receipt and disbursement of funds. Santamaria decided what to pay and what not to pay, and used Taleigh as the vehicle through which he controlled the funds available to pay O'Brien's creditors. Thus, the corporate entity of O'Brien with respect to all business transactions (including the payment of creditors) had no separate mind, will or existence of its own. The control exercised by Taleigh and Santamaria upon O'Brien resulted in the defrauding of MCI, by preventing MCI from collecting the final judgment rendered by this Court for MCI's telecommunications charges. Moreover, through the exercise of such control, O'Brien was able to evade its legal duty to pay the tariff charges for MCI's telecommunication services. The aforesaid control, which resulted in the draining of O'Brien's only asset, cash, and the breach of O'Brien's duty to pay the tariff charges, are the proximate cause of MCI's inability to execute on this Court's final judgments. The Court further finds that there was a total disregard of the corporate formalities by O'Brien and that O'Brien was obviously undercapitalized. Hence, the Court concludes that piercing O'Brien's corporate veil is appropriate in this case.

The impact of the Communications Act on this case further militates in favor of disre-

garding the corporate form of O'Brien. *Capital Tel. Co. v. F.C.C.*, 498 F.2d 734 (D.C.Cir. 1974). In *Capital*, the District of Columbia Circuit upheld the FCC's decision to pierce the corporate veil of an applicant for a paging frequency license, thereby denying the corporation's sole shareholder's application for a second license for an equally desirable frequency. *Id.* at 736–37. The court did not find it necessary to consider whether the prerequisites for piercing the corporate veil had been established under the strict alter ego standard. Rather, the decision to pierce the corporate veil was supported by the mandate of the Communications Act "to provide a fair, efficient, and equitable distribution of radio service." *Id.* at 739.

As in *Capital*, piercing the corporate veil in the instant case furthers a purpose of the Communications Act; namely, preventing unreasonableness of rates and discrimination in interstate telecommunications charges. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 462 F.Supp. 1072, 1088 (N.D.Ill.1978) (The Communications Act "is primarily designed to protect customers against unjust and discriminatory services."). Moreover, the requirement that carriers file their tariffs with the F.C.C. has been imposed by Congress for the purpose of "preventing unreasonableness and discrimination in charges." *MCI Telecommunications Corp. v. American Tel. & Tel. Co.*, —— U.S. ——, ——, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994). Discrimination against similarly situated customers would result if customers were able to evade legitimate telecommunications debts by manipulating the corporate form. In this case, Taleigh effectively obtained MCI's telecommunications services through O'Brien. Were Taleigh to escape O'Brien's liabilities, unreasonable discrimination between MCI customers would result because Taleigh would have received the benefit of "free" MCI service, while other MCI customers pay their own way. Indeed, those other customers would also be paying for Taleigh's services through higher MCI rates.

### CONCLUSION

Based on the foregoing considerations the Court concludes that Taleigh Corporation is liable, as the alter ego of O'Brien Marketing, Inc., for the Final Judgment in the amount of $62,754.85 and the Final Judgment on Attorney's Fees and Costs in the amount of $18,-924.16, previously entered in this action in favor of MCI Telecommunications Corporation and against O'Brien Marketing, Inc. In accordance with *Fed.R.Civ.P.* 58, the Court shall enter final judgment by separate order.

DONE and ORDERED.