**Carl Norman QUINN, Petitioner,**

v.

**Earl L. BUTZ, Secretary of Agriculture, and United States of America, Respondents.**

**No. 72–1396.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 9, 1973.

Decided Jan. 6, 1975.

---

Neil Koslowe, Atty. Dept. of Justice, of the bar of the Supreme Court of Georgia, *pro hac vice,* by special leave of court, for respondents. Walter H. Fleischer and Greer S. Goldman, Attys., Dept. of Justice, were on the brief for respondents.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Petitioner, Carl Norman Quinn, seeks review of orders[1] of the Secretary of Agriculture rendering him ineligible for employment by any licensee under the Perishable Agricultural Commodities Act[2] for a period of one year. These orders rest upon determinations that De-Vita Fruit Company, a corporate licensee, had flagrantly and repeatedly violated the Act, and that Quinn had then been "responsibly connected" with the company because he served nominally as its vice-president. Finding that the administrative record, in its present posture, does not support the action taken against Quinn, we remand the case to the Secretary for further proceedings.

## I. THE LEGISLATIVE BACK-GROUND

To facilitate an understanding of the issues presented for our review, we pause initially to briefly examine the purpose and principal features of the Act. Originally passed in 1930, this legislation was designed to combat a pattern of unfair practices prevalent in the perishable agricultural commodities industry.[3] The basic problem was victimization of growers and shippers by unscrupulous dealers to whom such commodities were sold or consigned for sale.[4] A conspicuous example was a sale followed by a decline in the market for the commodity and the dealer faced financial

Curtis E. von Kann, Washington, D. C., with whom William O. Bittman, Washington, D. C., was on the brief, for petitioner.

1. See note 35, *infra.*
2. Act of June 10, 1930, ch. 436, § 1, as amended, 7 U.S.C. § 499a et seq. (1970). Pertinent amendments to the Act since the 1970 codification are noted hereinafter.
3. H.R.Rep.No.1041, 71st Cong., 2d Sess. 1–2 (1930).
4. *Id.*

loss if he accepted shipment, paid the contract price and then sold on his own account. In such instances, dealers frequently rejected shipments on false grounds, notably that the commodities arrived in a condition other than as promised.[5] It was to eradicate these and other machinations that Congress settled on a statutory scheme which has been regarded as one of the Nation's most successful regulatory programs.[6]

In broad outline, the Act regulates the shipment of perishable agricultural commodities in interstate and foreign commerce through a system of licensing and administrative supervision of the conduct of licensees. Commission merchants, dealers and brokers in such commodities must obtain from the Secretary of Agriculture a license as a precondition to doing business.[7] By Section 2, licensees are forbidden to engage in specified unfair practices,[8] which include failure to make full payment promptly for commodities dealt in.[9] An unfair practice subjects the licensee to liability to the injured party for damages, recoverable either in a proceeding before the Secretary or by suit in court.[10] The Secretary is authorized to investigate complaints of unfair practices[11] and, finding a violation, to issue a reparation order requiring the offending licensee to pay damages.[12] Failure to obey the order automatically suspends the license during noncompliance.[13]

The Secretary is also empowered to suspend or revoke licenses for unfair practices,[14] and to limit employment within the industry of those who violate the Act and those who are "responsibly connected" with violators.[15] Section 8(b)

5. *Id.* at 1–2. Sellers of such commodities were also accused of unfair practices. "Many instances have arisen where the shipper, after having previously signed a contract to deliver the commodity on a certain date in the future, fails to do so when delivery would be to his disadvantage and he sells to some one else at a higher price." *Id.* at 2.

6. H.R.Rep.No.1546, 87th Cong., 2d Sess. 3, 1962 U.S.Code Cong. & Admin.News, p. 2749 (1962). See also Birkenfield v. United States, 369 F.2d 491, 494 (3d Cir. 1966).

7. Perishable Agricultural Commodities Act §§ 3, 4, 7 U.S.C. §§ 499c, 499d (1970).

8. *Id.* § 2, 7 U.S.C. § 499b (1970).

9. *Id.* § 2(4), 7 U.S.C. § 499b(4) (1970).

10. *Id.* § 5, 7 U.S.C. § 499e (1970).

11. *Id.* § 6, 7 U.S.C. § 499f (Supp. III 1973).

12. *Id.* § 7(a), 7 U.S.C. § 499g(a) (Supp. III 1973).

13. "Unless the licensee against whom a reparation order has been issued shows to the satisfaction of the Secretary within five days from the expiration of the period allowed for compliance with such order that he has either taken an appeal as herein authorized or has made payment in full as required by such order his license shall be suspended automatically at the expiration of such five-day period until he shows to the satisfaction of the Secretary that he has paid the amount therein specified with interest thereon to date of payment: *Provided*, That if on appeal the appellee prevails or if the appeal is dismissed the automatic suspension of license shall become effective at the expiration of thirty days from the date of the judgment on the appeal, but if the judgment is stayed by a court of competent jurisdiction the suspension shall become effective ten days after the expiration of such stay, unless prior thereto the judgment of the court has been satisfied." *Id.* § 7(d), 7 U.S.C. § 499g(d) (1970).

14. "Whenever (a) the Secretary determines, as provided in [§ 6], that any commission merchant, dealer, or broker has violated any of the provisions of [§ 2], or (b) any commission merchant, dealer, or broker has been found guilty in a Federal court of having violated [§ 14(b)], the Secretary may publish the facts and circumstances of such violation and/or, by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender . . . .." *Id.* § 8(a), 7 U.S.C. § 499h(a) (1970).

15. *Id.* § 8(b), 7 U.S.C. § 499h(b) (1970), which in relevant part provides:

Except with the approval of the Secretary, no licensee shall employ any person, or any person who is or has been responsibly connected with any person—
(1) whose license has been revoked or is currently suspended by order of the Secretary;
(2) who has been found after notice and opportunity for hearing to have committed any flagrant or repeated violation of section 499b of this title, but this provision shall not apply to any case in which the license of the person found to have committed

of the Act, in respects highly relevant to this case, provides that except with the Secretary's approval no licensee may employ any person, or anyone "responsibly connected" with a person, whose license has been revoked or is currently suspended, or who has been found to have committed any flagrant or repeated violation of Section 2, or against whom there is an unpaid reparation order issued within two years.[16] Section 1(9), another provision bearing importantly on this case, specifies that a person is "responsibly connected" with an offending licensee if he is affiliated with the licensee as officer, director or holder of more than 10% of its outstanding stock.[17]

## II. THE FACTUAL BACKGROUND

The material facts of the case at bar emerge without substantial dispute. Quinn commenced employment in the wholesale fruit and vegetable industry in 1944. During the first 12 years he worked as a truck driver and a buyer and seller of produce for different firms. In 1956, he was hired by John A. DeVita, who then conducted as a sole proprietorship a fruit and vegetable business in Lima, Ohio. Quinn supervised other employees in the packing and loading of produce; he also loaded trucks and made deliveries himself. From 1968 to 1970, his primary activity was buying and selling produce by telephone.

In 1964, DeVita incorporated his business. The assets and liabilities of the sole proprietorship were transferred to DeVita Fruit Company, a newly-organized Ohio corporation, in exchange for all of its issued stock. To meet a requirement of Ohio law, DeVita asked Quinn to become vice-president and Quinn assented.[18] Quinn's officership was purely nominal, and in no wise did his activities for the business change in consequence of the incorporation. DeVita remained sole stockholder and exercised full and exclusive control over the corporation's operations.

From October, 1964, onward DeVita Fruit Company obtained successive one-year licenses authorizing it to do business as a commission merchant, dealer and broker of perishable agricultural commodities in interstate and foreign commerce.[19] Between November, 1969, and July, 1970, however, the company failed to make full payment for 47 lots of fruits and vegetables shipped to it from outside Ohio. One of the shippers filed a complaint with the Department of Agriculture and on September 14, 1970, was awarded reparations.[20] When, 30 days later, the award remained unsatisfied, the company's license was automatically suspended by force of the Act.[21]

In the meantime, on September 5, 1970, pursuant to the Bankruptcy Act, DeVita Fruit Company filed a petition in the District Court for the Northern District of Ohio for an arrangement with its creditors.[22] A few days previously, the company had terminated Quinn's employment, and on October 1, 1970, he

---

such violation was suspended and the suspension period has expired or is not in effect; or

(3) against whom there is an unpaid reparation award issued within two years, subject to his right of appeal under section 499g(c) of this title. . . .

**16.** See note 15, *supra*. The Secretary is authorized to approve such employment at any time following nonpayment of a reparation award, or after one year following the revocation or finding of flagrant or repeated violation, upon the posting of bond. *Id.* The Secretary may also approve employment without bond after the expiration of two years from the effective date of the disciplinary order. *Id.*

**17.** "The term 'responsibly connected' means affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association . . . .." *Id.* § 1(9), 7 U.S.C. § 499a(9) (1970).

**18.** DeVita became president, and two others secretary and treasurer, respectively.

**19.** See text *supra* at note 7.

**20.** See text *supra* at note 10.

**21.** See note 13, *supra*.

**22.** See Bankruptcy Act, ch. XI, 11 U.S.C. § 701 et seq. (1970).

took a job with another wholesale fruit and vegetable company licensed to do business under the Act.[23] On December 8, 1970, DeVita Fruit Company was adjudged a bankrupt, but apparently never received a discharge.[24]

## III. THE ADMINISTRATIVE BACKGROUND

Several months later the Department of Agriculture moved against DeVita Fruit Company. On April 27, 1971, the Department's Consumer and Marketing Service sent a letter to the company calling attention to its outstanding financial obligations to the unpaid shippers. The letter advised that "[s]uch violations are sufficient grounds for instituting disciplinary action which could result in the revocation or suspension of your license," and that the company's explanation should be submitted within 20 days.[25] On June 22, no response having been received, the Service filed a complaint charging the company with violations of the Act by reason of its failure to pay the shippers and seeking revocation of the company's license.[26] Copies of the letter and complaint were sent to the company's officers, including Quinn, and no formal answer to the complaint was filed within the 20-day period allowed therefor.[27]

On July 13, 1971, however, during the period for answering the complaint, Quinn's attorney sent to the Division a letter asking for the opportunity to appear at a hearing "to present factual evidence and legal arguments which will show that [Quinn] was not 'responsibly connected' with the DeVita Fruit Company at the time of the alleged violations of the [Act] which form the basis for the subject complaint." The letter recited the facts disclosing the nature of Quinn's relationship with the company and was accompanied by supporting affidavits.

On August 16, 1971, the Division moved for the issuance of a hearing examiner's report in default proceedings[28] and again recommended that DeVita Fruit Company's license be revoked. A copy of this motion was sent to Quinn's attorney on August 19 together with a letter stating the Division's view that the request for a hearing to show that Quinn was not "responsibly connected" with the company was "not responsive to the allegations of the complaint," and so was not considered an answer to the complaint.

On August 25, Quinn's counsel wrote that he wished to dispute the charge that the company's violations were "flagrant or repeated" on the ground that the company's default was occasioned by reasonable expectations of a large business loan which did not materialize.[29] In response to the hearing examiner's direction that 'Service state on the record its position on counsel's request, the Service filed an opposition on the ground that "no useful purpose would be served in holding an oral hearing on the violations alleged in the Complaint because on its face the Request shows there is no issue as to whether the violations were repeated." The opposition added that

23. It was Quinn's employment by this licensee that gave rise to this litigation.

24. In his brief, Quinn states that the company was discharged in bankruptcy, Brief for Petitioner at 5, 12–16, but no supporting record reference is supplied. Respondents' brief makes the contrary claim and appendicizes a letter, outside the record, from a referee in bankruptcy for the Northern District of Ohio stating "that the bankrupt has neither petitioned for nor been granted a discharge in Bankruptcy." Brief for Respondent at 17, 2a.

25. We have already noted that by the terms of the Act the company's license had already been automatically suspended for nonpayment of the reparation award. See text *supra* at note 21.

26. See note 14, *supra,* and accompanying text.

27. See 7 C.F.R. §§ 47.30, 47.32(a) (1974).

28. See 7 C.F.R. § 47.30(c) (1974).

29. The letter stated that "the transactions referred to in the complaint were entered into by Mr. DeVita in anticipation of his receiving a $350,000 loan from Small Business Administration" which DeVita did not ultimately receive, but that "Mr. DeVita's reliance upon the SBA's intention to make this loan was reasonable under the circumstances."

"[t]here is no assertion that the violations did not occur, but rather an implicit admission that they did, with an expressed intention merely to challenge the character of those violations. . . . Whether these violations constitute flagrant violations of the Act need not be considered since the Act speaks in the disjunctive as regards 'repeated or flagrant' violations, and 47 violations are clearly 'repeated.' " In turn, Quinn's counsel replied that his letter of August 25 was not intended to suggest "that we conceded that the violations actually occurred or that if any did occur they were 'repeated' within the meaning of the statute." The reply reiterated facts descriptive of the relationship which Quinn bore to the company.

On October 29 the hearing examiner filed a recommended decision. As to the request to reopen the proceedings, the examiner pointed out that DeVita Fruit Company had not answered the complaint and held that Quinn's attempt to raise a defense based on the unsuccessful loan applications for "the apparent purpose [of] show[ing] that [the alleged violations] were not flagrant" did not negate their character as repeated violations.[30] The examiner thus concluded that the request to reopen should be denied. On the merits, the examiner proposed revocation of the company's license, concluding that the company's nonpayment of the reparation award and its failure to account for the remainder of the 47 lots of fruits and vegetables "constituted willful flagrant and repeated violations of" the unfair conduct provisions of the Act.[31] The examiner dimissed Quinn's lack-of-responsible-connection data with the observation that it

indicated a "primary interest . . . to obviate the provisions of the Act which affect officers of an organization found to have violated the Act, or collateral consequences of violations found." Quinn filed exceptions to the recommended decision, restating earlier arguments, and asked that the proceeding be reopened to enable him "to present factual evidence and legal argument as to the merits of the Complaint and his contention that he was not 'responsibly connected' with DeVita Fruit Company within the meaning of" Section 8(b).

The Secretary's final decision and order, by the Department's judicial officer, came on February 16, 1972. It adopted in all respects the recommended decision of the hearing examiner and revoked the license of DeVita Fruit Company. By letters of February 22, 1972, the Consumer and Marketing Service notified Quinn and his new employer of the decision and of Quinn's resulting ineligibility for employment under the Act for a period of one year from the effective date of the decision.[32] Quinn presented a petition for reconsideration and for reopening of the proceedings,[33] which the Consumer and Marketing Service resisted on the ground that the only proper issues in the proceedings were whether the alleged violations occurred and whether they were repeated or flagrant, and that uncontroverted facts required answers to both questions in the affirmative. The Service further asserted that "Mr. Quinn's real interest in contesting the allegations of violations in this proceeding is not to defend against the violations, but rather to endeavor to avoid the subsequent effect on his employment

**30.** The examiner based this position on Joseph Gangi & Sons, Inc., 30 Agri.Dec. 815, 816, aff'd sub nom., Fruit Salad, Inc. v. Secretary of Agriculture, 451 F.2d 162 (1st Cir. 1971).

**31.** See note 14, *supra.* Section 2 of the Act, 7 U.S.C. § 499b (1970), provides in relevant part:

It shall be unlawful in or in connection with any transaction in interstate or foreign commerce— . . .

(4) For any commission merchant, dealer, or broker to . . . fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any [perishable agricultural] commodity to the person with whom such transaction is had . . . .

**32.** See notes 15, 17, *supra.*

**33.** See 7 C.F.R. § 47.42(a), (b) (1974). The revocation order of February 16 was thereupon stayed pending action on the petition for reconsideration.

status should such violations ultimately be found to have occurred;" and that "[q]uestions as to whether Mr. Quinn was 'responsibly connected' with [DeVita Fruit Company] are not proper for consideration in this proceeding. Therefore, all arguments which have been made with respect to Mr. Quinn's status are irrelevant, and Mr. Quinn must seek any remedy he may have in this regard in the courts."

Quinn's petition for reconsideration was denied on April 4, 1972, and the effective date of revocation of the company's license was reset. On April 16, the Service sent Quinn's employer a letter directing Quinn's discharge for the one-year period, and sent Quinn a letter informing him of his ineligibility for employment during that period by licensees under the Act. Then followed the petition for review by this court,[34] attacking the action taken against the company as well as against Quinn.[35]

## IV. THE PROCEDURAL CONTENTIONS

■ Quinn presents for resolution four contentions, three of which require only relatively brief discussion. One is that the Secretary could not initiate a disciplinary action against DeVita Fruit Company because its license had already been suspended, by operation of the Act, on account of its discharge in bankruptcy.[36] We cannot accept Quinn's factual premise, for from aught that appears the company never did receive a discharge in the bankruptcy proceeding.[37] The disciplinary action, however, did not commence until after automatic suspension of the license by reason of the company's failure to satisfy the reparation award against it;[38] beyond that, the action endured well past the point at which the latest one-year term of the license expired.[39] For these latter reasons, Quinn's objection seemingly remains viable.

■ Nonetheless, we reject the point for in our view the Secretary's authority to institute disciplinary proceedings does not depend upon the continued existence of a once-effective license to do business under the Act. The purposes of such a proceeding extend to a determination as to whether a licensee has flagrantly or repeatedly violated the Act[40] and, if so, a further determination as to whether the licensee and those responsibly connected with the licensee should in the future be allowed to engage in further activity in the industry.[41] To say that the Secretary cannot decide these matters simply because the license has already been suspended for failure to pay a reparation award is to insulate those responsible for the failure from the statutory consequences of their own delinquency.[42] And to allow individual wrongdoers to escape such consequences by the fortuity of license expiration during the pendency of the disciplinary action is to promote an obvious inconsistency in the statutory scheme.[43] Congress hardly contemplated avoidance of the statutory sanctions in instances where, in the public interest, they are needed most.[44]

---

**34.** See 28 U.S.C. § 2342(2) (1970). The revocation order against DeVita Fruit Company has been stayed administratively, and the notice of Quinn's ineligibility for employment withdrawn, pending our decision on review.

**35.** The rulings of which review is sought are (a) the decision and order of February 16, 1972, revoking the license of DeVita Fruit Company; (b) the order of April 4, 1972, denying Quinn's motion for reconsideration; (c) the direction incorporated in the letter of April 17, 1972, to Quinn's employer to discharge him for the one-year period; and (d) the declaration in the letter of April 17, 1972, of Quinn's ineligibility for employment for that period.

**36.** See Perishable Agricultural Commodities Act § 4(a), 7 U.S.C. § 499d(a) (1970).

**37.** See note 24, *supra*.

**38.** See note 13, *supra*.

**39.** That point was October 26, 1971.

**40.** See note 14, *supra*.

**41.** See notes 15–16, *supra*.

**42.** Fruit Salad, Inc. v. Secretary of Agriculture, *supra* note 30, 451 F.2d at 163.

**43.** See *id.*

**44.** See *id.*

■ Quinn also argues that the Secretary's action in temporarily disapproving his employability is fundamentally faulty because the Department of Agriculture did not notify him beforehand that that could result from his undertaking to serve as vice-president of DeVita Fruit Company. More specifically, the argument is that the Department, in issuing a license to the company, took no steps to inform the company's officers of the sanctions applicable to them personally in the event that the license was subsequently revoked or suspended for conduct infringing the Act.[45] Appellees respond that the officers were bound, as a matter of law, to know the statutory provisions to which they became subject upon assuming office. Like Quinn, we cannot as a matter of logic subscribe to the oft-repeated proposition that everyone is presumed to know the law,[46] but like the Secretary we are satisfied that Quinn's argument cannot prevail. We perceive no statutory or constitutional duty on the Department to take affirmative steps to bring to Quinn's attention provisions that are matters of general law. Absent such a duty, we cannot accept Quinn's contention.

■ Quinn further resists the statutory penalty on the ground that he was wrongfully deprived of the opportunity to defend the charge that DeVita Fruit Company had committed flagrant and repeated violations of the Act.[47] We may assume, without deciding, that though the company did not oppose the charge against it, Quinn was entitled to do so if indeed he was in position to present matter constituting a legitimate defense. The insuperable difficulty in Quinn's position, however, is that the only "defense" he proffered was that the company had sought, but ultimately did not obtain, a loan to enable it to accommodate its financial obligations.[48] While conceivably a showing to that effect might have been relevant on the question whether the violations were flagrant, it had no tendency to meet the charge that they also were repeated. The statutory language is in the disjunctive; disciplinary action is authorized if violations of the Act are either "flagrant or repeated."[49] With defaults aggregating more than $100,000 due 19 shippers on 47 transactions over an eight-month period, we cannot overturn the Secretary's finding[50] that the company's violations were "repeated."[51]

## V. THE INTERPRETATION CONTENTION

We now turn to the remaining question Quinn tenders for decision: whether Section 1(9) of the Act[52] requires inexorably a holding that, as nominal vice-president of DeVita Fruit Company, Quinn was "responsibly connected" with the company, thereby foreclosing all opportunity to prove that he was not. We answer that question in the negative on each of two independent bases. Interpreting Section 1(9) conformably with accepted canons of statutory construction in light of its legislative history, we conclude that the section's formula for ascertaining responsible connection is rebuttable rather than absolute. We further conclude that in the current state of the record it cannot confidently be said

**45.** We are advised that, although there is no statute requiring it to do so, the Consumer and Marketing Service of the Department of Agriculture, as a matter of administrative practice, transmits a copy of the Act and the implementing regulations to each licensee along with his license.

**46.** See, e. g., Van Aalten v. Hurley, 176 F.Supp. 851, 857 (S.D.N.Y.1959); Martindale v. Falkner, 2 C.B. 706, 135 Eng.Rep. 1124, 1129 (1846).

**47.** See Part III, supra.

**48.** See note 29, supra, and accompanying text.

**49.** See notes 14, 15, supra.

**50.** See text supra at and following note 31.

**51.** George Steinberg & Son, Inc. v. Butz, 491 F.2d 988, 991, 992, 994 (2d Cir. 1974); Zwick v. Freeman, 373 F.2d 110, 114, 115 (2d Cir. 1967); Fruit Salad, Inc. v. Secretary of Agriculture, supra note 30, 451 F.2d at 163.

**52.** See note 17, supra.

that DeVita Fruit Company was a "corporation" within the meaning of Section 1(9), and so an organization to which the rule of that section applies.

### A. *The Issue*

The Act limits licensees in the employment of any person then or theretofore "responsibly connected" with another (a) whose license is revoked or currently suspended by the Secretary, or (b) who has been found to have committed any flagrant or repeated violation of the fair-practice provisions, or (c) against whom there is an unsatisfied reparation award issued within two years.[53] The Secretary revoked the license of DeVita Fruit Company for flagrant and repeated fair-practice violations after the license had been statutorily suspended for nonpayment of a reparation award.[54] Section 1(9) of the Act then became relevant by reason of its specification that "[t]he term 'responsibly connected' means affiliated or connected with a commission merchant, dealer, or broker as . . . officer . . . of a corporation. . . ."[55] The Secretary's ruling that Quinn is ineligible, at least temporarily, for reemployment in the industry is predicated flatly and exclusively on this provision.

Quinn contends that Section 1(9) is but a designation of categories of persons who prima facie are "responsibly connected" with a licensee, and who have the burden of proving, but also the prerogative of attempting to prove, a claim to the contrary. On the other hand, appellees argue, as had been administratively considered,[56] that Section 1(9) establishes a conclusive rule, barring anyone within its categories from undertaking to demonstrate that he was not "responsibly connected" with the offending licensee. So it was that the Secretary

proclaimed a one-year moratorium on Quinn's employability on the ground that Quinn was responsibly connected with DeVita Fruit Company when it transgressed the Act.[57] Indulging Section 1(9) an irreversible effect, the Secretary refused Quinn's request, repeated throughout the administrative proceeding,[58] for an opportunity to prove that actually he bore no such relationship to the company. The sole reason cited for the refusal was the view that Quinn's contention manifested a "primary interest . . . to obviate the provisions of the Act which affect officers of an organization found to have violated the Act, or collateral consequences of violations found."[59]

If the facts are as Quinn represented them during the proceeding, it could hardly be urged that he ever was "responsibly" affiliated with the company in any true sense of the word. In an uncontroverted affidavit submitted in support of his application for an evidentiary hearing, Quinn acknowledged that he allowed John DeVita to use his name as vice-president of the company to enable incorporation under Ohio law, but swore that never was he assigned duties or paid additional salary as vice-president; that never did he perform services as vice-president, or even attend meetings of the board of directors; and that indeed, after the corporation was formed, never was his status as vice-president even discussed.

Never, Quinn further avowed, did he have anything to do with policy or business decisions, or have access to the company's records, or have any knowledge of the company's financial difficulties. Other unopposed affidavits stated that Quinn's occupancy of the vice-presidency of DeVita Fruit Company was purely nominal, and that John DeVita, as sole

---

53. See note 15, *supra*, and accompanying text.

54. See Part III, *supra*.

55. See note 17, *supra*.

56. See Part III, *supra*.

57. See Part III, *supra*.

58. See Part III, *supra*.

59. See text *supra* following note 31. The language quoted is that of the trial examiner, whose recommended decision, as there pointed out, was adopted by the Department's judicial officer, acting for the Secretary.

stockholder, completely controlled the company and effectively exercised the ultimate decision-making power in all aspects of company operations.

These circumstances, if they existed, would demonstrate not only that Quinn did not to any extent participate in the management of the company's affairs, but also that he was totally without power to do so; in other words, that Quinn did not bear any responsible connection with the company. They would also generate at least a doubt as to whether this one-man corporation dominated by its sole stockholder was a "corporation" within the contemplation of Section 1(9) to which the rule prescribed by that section could apply. The Secretary did not consider either of these aspects of the case, and the twin questions are whether he erred in not doing so.

### B. *Conclusiveness of Section 1(9)*

■ The statutory language leaves open the question whether Section 1(9)'s definition of "responsibl[e] connect[ion]" is rebuttable or irrebuttable, and the Secretary's view that it is irrefutable ignores well settled canons of statutory construction. The Secretary's interpretation obviously rests upon a literal reading of the language, a technique which well may stifle true legislative intent.[60] "It is a 'familiar rule,'" the Supreme Court has stated, "'that a thing may be within the letter of the statute and yet not within the statute, because not with-

in its spirit nor within the intention of its makers.'"[61] Moreover, a construction of a statute leading to unjust or absurd consequences should be avoided.[62] And "even when the plain meaning [of statutory language] did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' [the Court] has followed that purpose, rather than the literal words."[63]

Lacking enlightenment from the bare language of Section 1(9), we look to its legislative history, and there we find nothing showing that Congress opted for an incontestable formula for ascertaining "responsibl[e] connect[ion]" through corporate officership. As originally enacted in 1930, Section 8 empowered the Secretary to suspend or revoke the authority of a licensee to do business under the Act, but contained no provision enabling restrictions on future employment of those who were violators in an employee capacity.[64] Thus, for example, a violator could circumvent the Act by the subterfuge of acting as an "employee" of a dummy corporation newly licensed.[65] By enactment of what is now Section 8(b) in 1934[66] and amendment thereof in 1956,[67] the Secretary was authorized to revoke a license when the licensee, after notice from the Secretary, continued to employ in a "responsible position" one whose own license had been revoked or suspended or one who had been "responsibly connected" with a licensee who incurred

---

**60.** See Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 90 L.Ed. 1071 (1946); Cleary v. Chalk, 159 U.S.App.D.C. 415, 422, 488 F.2d 1315, 1322 (1973); Lange v. United States, 143 U.S.App.D.C. 305, 307–308, 443 F.2d 720, 722–23 (1971).

**61.** National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 619, 87 S.Ct. 1250, 1255, 18 L.Ed.2d 357 (1967); Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892).

**62.** United States v. American Trucking Ass'ns, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); Hagger Co. v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 93, 84 L.Ed. 449 (1940); Hecht v. Pro-Football, Inc., 144 U.S. App.D.C. 56, 70, 444 F.2d 931, 945 (1971),

cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972).

**63.** United States v. American Trucking Ass'ns, *supra* note 62, 310 U.S. at 543, 60 S.Ct. at 1064, quoting Ozawa v. United States, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199 (1922).

**64.** Act of June 10, 1930, ch. 436, § 8, 46 Stat. 535.

**65.** See S.Rep. No. 2485, 84th Cong., 2d Sess. 4 (1956); H.R.Rep. No. 1196, 84th Cong., 1st Sess. 3 (1955). See also H.R.Rep. No. 489, 73d Cong., 2d Sess. 2 (1934).

**66.** Act of Apr. 13, 1934, ch. 120, § 14, 48 Stat. 588.

**67.** Act of July 30, 1956, ch. 786, § 5, 70 Stat. 727.

revocation or suspension.[68] These charges, however, left to the Secretary the task of ascertaining what in the way of new employment constituted a "responsible position," and who in the way of old employment had been "responsibly connected" with a violating licensee.

It was to ameliorate the problems incidental to such determinations that Congress in 1962 again amended Section 8(b).[69] As Secretary Freeman commented, a major purpose of the bill proposing the amendments was

> to improve and clarify the provisions relating to relicensing or employment of persons who had violated the act or had been affiliated with such persons; [70]

as he pointed out,

> frequent attempts are made to circumvent the law following revocation or suspension of a license. Effective enforcement of the act, therefore, rests on having comprehensive, *clear, and equitable* provisions relating to relicensing and employment which fully cover the situations encountered in this area in the fruit and vegetable industry.[71]

Additionally, the hearings on the bill which eventually produced the 1962 amendments disclosed difficulty in securing evidence that an individual had a "responsible position" with a new employer-licensee,[72] and the focus on the troubles brewed by "responsible position" with a new employer was much greater than on any germinated by "responsibl[e] connect[ion]" with a former employer. As the House Committee on Agriculture explained,

> [a]ny licensee hiring a person without the approval of the Secretary in violation of this provision, after notice and opportunity for hearing, may have his license suspended or revoked. At present the act applies only to the employment of a person in a responsible position. This has caused serious difficulties due to the problem of delineating what constitutes a responsible position under all circumstances and the difficulty of ascertaining the true nature of the employee's relationship with the licensee. Under the present provisions of the act the restrictions against employment are directed specifically to persons whose licenses had been revoked or suspended and persons responsibly connected therewith. The bill extends such restrictions to persons whose licenses could have been revoked or suspended if they had had active licenses. As amended, section 8(b) would prohibit employment of persons covered by it unless such employment is approved by the Secretary; whereas at present it prohibits such employment only after notice by the Secretary.[73]

Simultaneously with the 1962 amendment of Section 8(b), Congress added the present Section 1(9) as a new provision of the Act. The explanation for this addition was sparse. When the Committee reported the bill out favorably, it stated merely that Section 1(9) would give the term "responsibly connected" and others "specific meaning, thus avoiding possible confusion as to interpretations." [74] There is nothing to indicate that the Committee was so gravely con-

---

**68.** The restriction imposed in 1934 precluded employment only of those whose licenses had been revoked and those "responsibly connected" with them. The 1956 amendment extended the restrictions to employment of suspended licensees and their "responsibly connected" affiliates. See H.R.Rep. No. 1156, 84th Cong., 1st Sess. 3 (1955).

**69.** Act of Oct. 1, 1962, Pub.L. No. 87–725, § 11, 76 Stat. 675.

**70.** Hearings on H.R. 5023 Before the Subcommittee on Domestic Marketing of the House Committee on Agriculture, 87th Cong., 1st Sess., ser. P, at 4 (1961).

**71.** *Id.* (emphasis supplied).

**72.** *Id.* at 15, 79.

**73.** H.R.Rep. No. 1546, 87th Cong., 2d Sess. 8 (1962), 1962 U.S.Code Cong. & Admin.News, p. 2755. See also S.Rep. No. 750, 87th Cong., 1st Sess. 7 (1961).

**74.** H.R.Rep. No. 1546, 87th Cong., 2d Sess. 4, 1962 U.S.Code Cong. & Admin.News, p. 2751 (1962). See also S.Rep. No. 750, 87th Cong., 1st Sess. 2 (1961).

cerned about an employee's past relations with a defaulting licensee as to intend the provision of an absolute rule on that score.

We do not find in this history a clear purpose to fashion what in the Secretary's view was an irrebuttable presumption of responsible connection with an organizational licensee merely from officership in the organization. Secretary Freeman did not ask for such a presumption,[75] and the House Committee on Agriculture stated as the single object of Section 1(9) the provision of a definition to unify interpretations of "responsibly connected," as distinguished from an effort to absolutely bar inquiry as to whether one who satisfied the definition was really "responsibly connected" with an offending licensee.[76] What seems as likely to have been contemplated was the specification of a standard by which the caliber of licensee-connections could be ascertained, rather than a mechanical and possibly inequitable ascertainment of such a connection for all cases. If either the Secretary or the Committee had in mind the drastic effect which appellees attribute to Section 1(9), we would have expected a good deal more explication in that regard.

Moreover, assuming a passionate congressional concern about proof that an employee was responsibly connected, rather than a definition of when an employee was so affiliated, it does not follow that Congress settled on an irreversible presumption as the solution. Undeniably, the proof problem is eased greatly by a rule establishing prima facie a responsible connection from officership and casting upon the officer the obviously heavy burden of demonstrating satisfactorily to the Secretary that such a connection did not actually exist. Congress has frequently supplied rebuttable presumptions and inferences to meet similar difficulties of proof,[77] and there is no significant indication that Congress felt that more was needed here.

The injustice,[78] indeed the absurdity,[79] of irrebuttably presuming that one is responsibly connected when actually he is not is readily apparent. If those who profess to know the facts are to be believed, Quinn was an officer of DeVita Fruit Company only on paper. Undeniably, the Perishable Agricultural Commodities Act was designed to strike at persons in authority who acquiesced in wrongdoing as well as the wrongdoers themselves.[80] But by the Secretary's construction of Section 1(9), it also smites one who was not only unaware of the wrongdoing but also powerless to curb it.[81]

■ We are not persuaded that Congress, in enacting Section 1(9), intended that consequence. We think that when Congress decides to impose a conclusive presumption, its purpose must be, not merely arguable, but unmistakable. Here there is an almost total lack of indicia of such a purpose in the legislative history of Section 1(9). At the same time, the Act is replete with delegations to the Secretary of duties—some, diffi-

---

75. See text *supra* at notes 70–71.

76. See text *supra* at note 73.

77. See Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); Adler v. Board of Educ., 342 U.S. 485, 494–496, 72 S.Ct. 380, 96 L.Ed. 517 (1952); Bandini Petroleum Co. v. Superior Court, 284 U.S. 8, 18–19, 52 S.Ct. 103, 76 L.Ed. 136 (1931); United States v. Los Angeles, S. L. R.R., 273 U.S. 299, 311–312, 47 S.Ct. 413, 71 L.Ed. 651 (1927); Luria v. United States, 231 U.S. 9, 25–27, 34 S.Ct. 10, 58 L.Ed. 101 (1913).

78. See text *supra* at note 62.

79. See text *supra* at notes 62–63.

80. See text *supra* at notes 64–74.

81. Quinn, now approaching the half-century mark in life with a wife and seven children, suddenly finds himself banned from the industry in which he has worked since a teenager. He has no income other than his present salary, and no vocational experience other than in the wholesale fruit and vegetable industry. He faces this dilemma allegedly because he acceded to the request of his employer that his name be used to enable incorporation of the business for which he continued to work merely as an employee just as before.

cult duties—requiring exertion of his fact-finding and discretionary power.[82] There is ample basis for believing that in promulgating the formula set forth in Section 1(9), Congress contemplated the same administrative exercise.

To sum up, Congress provided, as the Secretary proposed, that once the Secretary determined that a person's license be suspended or revoked, the ensuing sanction should be prescribed by a "clear and equitable"[83] rule that denied him any employment, for the pertinent period, rather than require a new determination of precisely which positions were closed. But for something as consequential as the initial order of suspension or revocation of license, which traditionally rests on determination of personal fault, it would take more than the bare test and skimpy history of the statute before us to establish that this consequence was intended to be visited on a basis of absolute liability, of liability without either personal fault or a realistic capacity to counteract or obviate the fault of others.

■ We hold, then, that the rule of "responsibl[e] connect[ion]" forged by Section 1(9) is rebuttable.[84] It operates unless and until there is a proffer of proof of facts and circumstances which might reasonably lead to the conclusion that actually the connection was lacking. When, however, such a proffer is made, the opportunity of proof must be accorded, and the issue must be resolved on the evidence. Quinn made a suitable proffer, and must now be given a chance to submit his proof.[85]

## C. Applicability of Section 1(9)

Quite apart from the considerations just discussed, there is another which demonstrates the Secretary's error in refusing to consider Quinn's proffer in connection with the determination that the statutory limitations on reemployment applied to him. The refusal rested on the theory that Quinn could not be permitted to contest the operation of Section 1(9)'s definition of an officer of a corporate violator as one responsibly connected with the corporate licensee,[86] and

---

**82.** See Perishable Agricultural Commodities Act §§ 3(a), (c), 4(b), (c), (d), (e), 6(a), (c), (e), 7(a), (d), 8(a), (b), (c), 10, 12, 13(a), (c), (d), 14(a), 15, 7 U.S.C. §§ 499c(a), (c), 499d(b), (c), (d), (e), 499f(a), (c), (e), 499g(a), (d), 499h(a), (b), (c), 499j, 499l, 499m(a), (c), (d), 499n(a), 499o (1970).

**83.** See text *supra* at note 71.

**84.** We do not consider our construction of § 1(9) inconsistent with either of two decisions upon which appellees endeavor to support the position that a conclusive presumption is provided. In Fruit Salad, Inc. v. Secretary of Agriculture, *supra* note 30, there was no claim that officers affected by an order suspending a corporate license were not in fact "responsibly connected" with the corporation; the challenge was predicated upon an entirely different ground. See notes 42–44, *supra*, and accompanying text. In Birkenfield v. United States, *supra* note 6, where one who admittedly had been treasurer, director, and 10%-plus stockholder of an offending corporate licensee asserted that "he never had real responsibility in" the corporation's affairs, *id.* 369 F.2d at 494, the court held merely that "[t]he automatic exclusion of 'responsibly connected' persons is not irrational or arbitrary under the circumstances."

*Id.* The court felt that "the relationships of director, officer or substantial shareholder form a sufficient nexus for the arbitrary conclusion of responsible connection," *id.*, and that "[t]he fact that an individual has not exercised 'real' authority in the sanctioned company is not controlling." *Id.* We have no difficulty with the conclusion that one genuinely an officer is not the less "responsibly connected" with his corporation simply because he does not use the powers of his office. We think, however, that the situation is radically different where the affiliation is purely nominal and the so-called officer had no powers at all.

**85.** In light of our construction of § 1(9), it is unnecessary to consider whether as a definition of a conclusive presumption the section could have passed constitutional muster. See, *e. g.*, Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 644–650, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); Vlandis v. Kline, 412 U.S. 441, 446–454, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). The obviously rational relationship between officership in a corporation and responsible connection with the corporation clearly sustains it as a rebuttable presumption. See Leary v. United States, 395 U.S. 6, 32–36, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

**86.** See note 17, *supra*.

as such one whose reemployment was enjoined by Section 8(b).[87] We are unable to accept the Secretary's view that Section 1(9) was to be given automatic operation in the circumstances of this case.

To briefly recapitulate, Section 8(b) imposes restrictions on the employment of those who formerly were "responsibly connected" with revoked or suspended licensees.[88] The restraint on Quinn did not follow any determination that he was responsibly connected with DeVita Fruit Company as a matter of fact. Indeed, the Secretary declined to consider evidence, proffered by affidavits Quinn submitted, which if believed would have demonstrated that he never had such a relationship with the company. The Secretary relied instead upon the definition of "responsibly connected" set forth in Section 1(9), which he deemed unavoidable and incontrovertible in its effect upon Quinn.

Section 1(9), however, purports to attribute to Quinn a responsible connection with DeVita Fruit Company only if the company was a "corporation" within that section's meaning, and Quinn's tender challenged the Secretary's assumption that it was. The tender included an affidavit by Charles W. Daley, an attorney who had prepared and filed the articles of incorporation converting the DeVita business from individual to corporate form, and who thereafter had served as secretary of the corporation. Daley stated that "all decision making in this corporation was done by [John A.] DeVita who, throughout the entire corporate existence, was the sole stockholder." More importantly, there was also the affidavit of John DeVita, who stated "that in the conduct of his business as a corporation, affiant as shareholder, elected the directors of the corporation from year to year and that said directors as elected by affiant, elected the officers of the corporation;" and "that all policy decisions of the corporation with reference to the company operations were made by affiant throughout and where appropriate through his Board of Directors, but affiant effectively · retained the decision making power in all aspects of corporate decision making." So a question arises as to whether the organization which DeVita individually dominated and controlled could in legal contemplation be treated only as a corporation. The further question is whether the Secretary was correct in his apparent conclusion that he lacked discretion to treat the DeVita organization in any other way.

A corporation is ordinarily to be viewed as a distinct entity,[89] even when it is wholly owned by a single individual.[90] This concept is, however, designed to serve normal, inoffensive uses of the corporate device, and is not to be stretched beyond its reason and policy.[91] Only recently we reminded that "[t]he courts have consistently recognized that a corporate entity must be disregarded in the interest of public convenience, fairness and equity"[92] and that

> [i]f any general rule can be laid down, in the present state of authority, it is that a corporation can be looked upon

87. See Part III, *supra*.

88. See note 15, *supra*.

89. *E. g.*, Jones v. Helvering, 63 App.D.C. 204, 207, 71 F.2d 214, 217, cert. denied, 293 U.S. 583, 55 S.Ct. 97, 79 L.Ed. 679 (1934); Callas v. Independent Taxi Owners' Ass'n, 62 App. D.C. 212, 213, 66 F.2d 192, 193, cert. denied, 290 U.S. 669, 54 S.Ct. 89, 78 L.Ed. 578 (1933).

90. Eichelberger v. Arlington Bldg., Inc., 52 App.D.C. 23, 25, 280 F. 997, 999 (1922); El Salto, S. A. v. PSG Co., 444 F.2d 477, 483 (9th Cir.), cert. denied, 404 U.S. 940, 92 S.Ct. 273, 30 L.Ed.2d 253 (1971); Robertson v. Roy L. Morgan Prod. Co., 411 F.2d 1041, 1043 (10th Cir. 1969).

91. "[T]here is an exception to the entity rule, where its recognition would result in promoting illegality, fraud, or injustice. In other words, since the franchise is granted by the state for a useful and valid purpose, it may not be employed to further wrong. Where it is so employed the law will disregard the rule, go behind the fiction, and treat the stockholders as if the corporation did not exist." Eichelberger v. Arlington Bldg., Inc., *supra* note 90, 52 App.D.C. at 25, 280 F. at 999 (citations omitted).

92. Capital Tel. Co. v. FCC, 162 U.S.App.D.C. 192, 196, 498 F.2d 734, 738 (1974) (citations omitted).

as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.[93]

This doctrine is firmly entrenched in our jurisprudence,[94] and it has been utilized in a variety of situations,[95] not the least of which are those wherein the corporation is simply the alter ego of its owners.[96] Here we speak not merely of single ownership,[97] or of deliberate adoption and use of a corporate form in order to secure its legitimate advantages,[98] but of such domination of a corporation as in reality to negate its separate personality.[99] When, at some innocent party's expense, the corporation is converted into such an instrumentality, "the courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."[100]

So, in Capital Telephone Company v. FCC,[101] we upheld an agency's treatment of separate applications by a corporation and an individual for two high-band radio channels as a single application because the individual was the sole stockholder of the corporation and controlled its operations as well as his own.[102] In Mansfield Journal Company v. FCC,[103] we sustained the agency's denial of separate applications by two newspaper companies for two radio-station licenses because the companies were wholly owned and actively controlled by one family.[104] In S.O.U.P., Inc. v. FTC,[105] we looked past a corporation to its members to ascertain eligibility to appeal *in forma pauperis*.[106] Many other courts for a variety of purposes have similarly disregarded the corporate fiction where its recognition would pervert the truth.[107]

---

**93.** *Id.,* quoting United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (C.C. E.D.Wis.1905). See also Francis O. Day Co. v. Shapiro, 105 U.S.App.D.C. 392, 396, 267 F.2d 669, 673 (1959); Callas v. Independent Taxi Owners' Ass'n, *supra* note 89, 62 App. D.C. at 213, 66 F.2d at 193.

**94.** See the cases collected in 1 W. Fletcher, Corporations, §§ 41–46 (rev. ed. 1963) and Annot., 46 A.L.R.3d 428 (1972).

**95.** Prominently included are those wherein the corporate fiction would enable circumvention of a statute, Anderson v. Abbott, 321 U.S. 349, 362–363, 64 S.Ct. 331, 88 L.Ed. 793 (1944); Joseph A. Kaplan & Sons, Inc. v. FTC, 121 U.S.App.D.C. 1, 3 n. 4, 347 F.2d 785, 787 n. 4 (1965); Alabama Power Co. v. McNinch, 68 App.D.C. 132, 149, 94 F.2d 601, 618 (1937), or evasion of personal liability, Anderson v. Abbott, *supra,* 321 U.S. at 362–363, 64 S.Ct. 531; Francis O. Day Co. v. Shapiro, *supra* note 93, 105 U.S.App.D.C. at 396–398, 267 F.2d at 673–675; Callas v. Independent Taxi Owners' Ass'n, *supra* note 89, 63 App.D.C. at 213–215, 66 F.2d at 193–195.

**96.** Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 500–501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918); Capital Tel. Co. v. FCC, *supra* note 92, 162 U.S. App.D.C. at 195–197, 498 F.2d at 737–739; Rosen v. Cain, 94 U.S.App.D.C. 72, 211 F.2d 809 (1954); Mansfield Journal Co. v. FCC, 86 U.S.App.D.C. 102, 111, 180 F.2d 28, 37 (1950). See also Pardo v. Wilson Line of Washington,

Inc., 134 U.S.App.D.C. 249, 253–254, 414 F.2d 1145, 1149–1150 (1969); Francis O. Day Co. v. Shapiro, *supra* note 93, 105 U.S.App.D.C. at 396–397, 267 F.2d at 673–674. See also cases cited *infra* note 107.

**97.** See text *supra* at note 90.

**98.** See, *e. g.,* Schenley Distillers Corp. v. United States, 326 U.S. 432, 436–437, 66 S.Ct. 247, 90 L.Ed. 181 (1946).

**99.** See cases cited *supra* notes 91–93, 95–96 and *infra* note 107.

**100.** Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n, *supra* note 96, 247 U.S. at 501, 38 S.Ct. at 557. See also Anderson v. Abbott, *supra* note 95, 321 U.S. at 363, 64 S.Ct. 531.

**101.** *Supra* note 92.

**102.** *Id.* at 195–197, 498 F.2d at 737–739.

**103.** *Supra* note 96.

**104.** 86 U.S.App.D.C. at 111, 180 F.2d at 37.

**105.** 146 U.S.App.D.C. 66, 449 F.2d 1142 (1971).

**106.** *Id.* at 66–67, 449 F.2d at 1142–1143.

**107.** Dickey v. NLRB, 217 F.2d 652, 653 (6th Cir. 1954) (to subject partners who incorporated to a certification order); Bruhn's Freezer Meats of Chicago, Inc. v. United States Dep't of Agriculture, 438 F.2d 1332, 1342–1343 (8th Cir. 1971) (to sustain a cease and desist order against corporate officers individually); Oscarson v. Norton, 39 F.2d 610, 612

We are mindful that penetration of the corporate veil is a step to be taken cautiously,[108] and usually it is urged by rather than against the Government, but the ultimate principle is one permitting its use to avoid injustice, and the case at bar presented a situation warranting consideration of just such a step. Quinn made a preliminary showing that John DeVita dominated and exclusively controlled DeVita Fruit Company, and that his dominion over its affairs and operations was as complete as when the business was conducted as a sole proprietorship. Quinn's showing plainly indicated, too, that acceptance of the company as a Section 1(9) corporation, and as a result the invocation against Quinn of the statutory restrictions on employment, would work a grave injustice on him.[109] Moreover, the irrationality of holding an employee "responsibly connected" with the licensee when actually he was not is self evident.

We conclude that the Secretary erred in failing to consider Quinn's evidence.

We have admonished that "the fiction of a corporate entity cannot stand athwart sound regulatory practice;"[110] we have said that, on the contrary, "[t]o carry out statutory objectives, it is frequently necessary to seek out and to give weight to the identity and characteristics of the controlling officers and stockholders of a corporation."[111] Nothing in the legislative history of the Perishable Agricultural Commodities Act suggests that the Secretary is powerless, in administrating Section 1(9), to apply a doctrine commonplace in judicial decision-making. The Act entrusts many regulatory matters to the Secretary's discretion,[112] and Section 1(9) is not so all-inclusive a definition of "responsibl[e] connect[ion]"[113] as to negate the normal function of administrative interpretation of its terminology.[114]

It was not necessary for Quinn to allege actual fraud in the incorporation of DeVita Fruit Company;[115] it sufficed that the corporate fiction actually

(9th Cir. 1930) (to treat a dedication by a corporation as one to the stockholders' uses); Sell v. United States, 336 F.2d 467, 472 (10th Cir. 1964) (to ascertain the ownership of grain for purposes of a criminal prosecution); United States v. Goldberg, 206 F.Supp. 394, 405–406 (E.D.Pa.1962) (to ascertain the recipient of taxable income); Industrial Research Corp. v. General Motors Corp., 29 F.2d 623, 625–626 (N.D.Ohio 1928) (to sustain the service of process); In re Rieger, Kapner & Altmark, 157 F. 609 (S.D.Ohio 1907) (to extend a receivership of a firm to a subsidiary corporation's property); Palmolive Co. v. Conway, 43 F.2d 226, 229–230 (W.D.Wis.1930) (to prevent a tax evasion); Minifie v. Rowley, 187 Cal. 481, 202 P. 673, 676 (1921) (to regard payments by a corporation as individual payments, tolling the limitation period on an individual debt); Caspers v. Chicago Real Estate Bd., 58 Ill.App.2d 113, 206 N.E.2d 787, 789 (1965) (to bar a malicious prosecution suit against plaintiff's corporation); Telis v. Telis, 132 N.J.Eq. 25, 26 A.2d 249, 250–251 (1942) (to allow dower in a husband's realty); Commonwealth v. Shafer, 414 Pa. 613, 202 A.2d 308, 313–314 (1964) (to impose criminal liability).

108. Pardo v. Wilson Line of Washington, Inc., *supra* note 96, 134 U.S.App.D.C. at 253–254, 414 F.2d at 1149–1150.

109. See note 81, *supra*.

110. Capital Tel. Co. v. FCC, *supra* note 92, 62 U.S.App.D.C. at 196 n. 11, 498 F.2d at 738 n.

11, quoting H. P. Lambert Co. v. Secretary of Treasury, 354 F.2d 819, 822 (1st Cir. 1965). See also Central & So. Motor Freight Tariff Ass'n v. United States, 273 F.Supp. 823, 931–932 (D.Del.1967).

111. Mansfield Journal Co. v. FCC, *supra* note 96, 86 U.S.App.D.C. at 111, 180 F.2d at 37 (citations omitted). See also Capital Tel. Co. v. FCC, *supra* note 92, 62 U.S.App.D.C. at 197, 498 F.2d at 739.

112. See note 82, *supra*, and accompanying text.

113. An employee managing the operations of a concern doing business as a sole proprietorship, for example, is "responsibly connected" with the owner of the business, and seemingly would encounter the employment bar of § 8(b) as a person "responsibly connected" although he does not fit the definition of "responsibl[e] connect[ion]" supplied by § 1(9), which in scope is limited to organizational personnel.

114. Compare Capital Tel. Co. v. FCC, *supra* note 92, 62 U.S.App.D.C. at 195, 498 F.2d at 737; Mansfield Journal Co. v. FCC, *supra* note 96, 86 U.S.App.D.C. at 106–107, 180 F.2d at 32–33; Bruhn's Freezer Meats of Chicago, Inc. v. United States Dep't of Agriculture, *supra* note 107, 438 F.2d at 1343.

115. Francis O. Day Co. v. Shapiro, *supra* note 93, 105 U.S.App.D.C. at 396 n. 11, 267 F.2d at 673 n. 11.

visited an injustice upon him.[116] Quinn's proffer suitably challenged the operation of Section 1(9) and he is entitled to an opportunity to show that the company was not in truth a corporation within the objective which Congress contemplated.[117] If Quinn succeeds in establishing that the company is not properly to be recognized as a legal entity, it would follow that the definition of "responsibl[e] connect[ion]" contained in Section 1(9) has no application to him.[118]

We affirm the Secretary's action save to the extent that Quinn's evidentiary proffer was rejected. To the end that it may now be considered, we reverse the Secretary's action and remand the case to the Secretary for proceedings in harmony with this opinion.

So ordered.

**116.** *Id.* at 396, 267 F.2d at 673. See also cases cited *supra* note 81.

**117.** Compare NLRB v. Deena Artware, Inc., 361 U.S. 398, 402, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960).

**118.** See cases cited *supra* notes 91–93, 95–96, 100–107.